Filed 8/27/13  In re A.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | D063632 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ2866) |
| v. | |
| MICHAEL C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Michael C. appeals an order declaring his minor daughter A.C. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivisions (b) and (c), and removing her from his custody.[1]  Michael contends that there was insufficient evidence to support the court's order because there were disposition alternatives available that were less drastic than removal.  Michael also argues that there was insufficient evidence to support the court's finding that active efforts were made to prevent the removal of A.C. from Michael's custody, as required by the Indian Child Welfare Act, 25 U.S.C. section 1901 et seq. (ICWA).  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2007, when A.C. was two years old, she was the subject of an earlier dependency proceeding.  At that time, she was removed from her parents' care after multiple reports of domestic violence and an incident during which Michael attempted to break up a physical fight between A.C.'s mother, Melody, and another woman, while he was holding A.C.  The court ordered reunification services for the family, including a psychological evaluation for the mother,[2] individual counseling for both parents, in-home support services and domestic violence treatment.  Melody completed counseling; Michael did not.  Michael also failed to complete the domestic violence services, and both parents refused in-home support services.  Despite the parents' failure to fully

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]     Melody was diagnosed with antisocial, narcissistic personality traits, and possible personality disorder.

2

comply with their reunification plans, A.C. was reunified with her parents in 2008 and the dependency case was closed.[3]

Beginning in 2010, the Agency received a string of referrals concerning A.C. related to domestic violence between the parents in A.C.'s presence, drug use by both parents and hospitalization of Melody related to her drug use and mental illness. In November 2011, the Agency initiated further investigation of the family after police were called to the home because Melody had threatened to kill Michael and pointed an unloaded shotgun at him in front of A.C. Melody was arrested and incarcerated as a result of this incident. Michael obtained a criminal protective order against Melody that precluded Melody from seeing A.C. or Michael. The expiration date of the protective order was November 2014.[4] The Agency closed the investigation based on the issuance of the protective order and Michael's agreement to protect A.C. from Melody.

In 2012, the Agency received another series of referrals concerning then seven-year-old A.C. In April, A.C. was reported displaying inappropriate sexual behavior involving a Barbie doll. In September, A.C. told school staff that her father hit her. In October, the Agency received a report that A.C. stated that her mother had killed herself or was going to kill herself by jumping off a bridge or stabbing herself. The situation

[3]     In addition, the San Diego County Health and Human Services Agency (the Agency) received referrals related to A.C. before she was removed from her parents' custody in 2007 and the parents had both received voluntary services from the Agency in 2006. Michael also has prior child welfare history related to his older children.

[4]     Michael had previously obtained a restraining order against Melody in April of 2011 after Melody suffered a psychotic episode. It is unclear from the record whether this order was cancelled, or rather, whether Michael simply ignored it, but in either event, he allowed Melody to have contact with A.C. shortly after the order was issued.

came to a head in early November after a series of reports to the Agency. On the same day that the Agency received reports that A.C. had been absent from school for five days and that Michael and Melody were using drugs, the police were called to Michael's house three times. The first call was related to reports of domestic violence. The next two calls were from Michael's son, who reported that Michael was threatening to commit suicide. After the third call, the police visited the house twice, but no one was home either time. Four days later, a neighbor called the police at 6:33 a.m. to report that the parents had been fighting all night and that Melody was outside the house yelling that A.C. had been raped. The police arrived and took Melody to the county mental health hospital.

The following day, A.C. was interviewed at school by the Agency's social worker. During the interview, A.C. demonstrated odd, inappropriate behavior and gave alarming answers to the social worker's questions. For example, she told the social worker that a demon had made her watch pornographic images on the computer and said that the demon was going to make her kill her parents and herself. In response to questions about her absence from school, A.C. gave strange and inconsistent answers, at one point stating that her uncle had taken her to the mountains and had been sleeping in the same bed with her. At another point in the interview, A.C. told the social worker that Michael had told her not to tell anyone why she had been absent from school.

Michael was interviewed the same day and made conflicting statements about A.C.'s absence from school, his own whereabouts and Melody's contact with A.C. The Agency also discovered that Michael had cancelled the protective order against Melody. Melody was interviewed at the county mental health hospital. She alleged that Michael

4

was sexually abusing A.C. and using drugs, and claimed that Michael had held her and A.C. hostage. She also spoke incoherently about poison in the drinking water and bombings and stated that she had taken methamphetamine that she believed had been laced with PCP.

The day after the interviews, the Agency filed a petition in the juvenile court under Welfare and Institutions Code section 300, subdivision (b), alleging that A.C. was at substantial risk of serious physical harm due to her parents' mental illness and drug abuse and their inability to provide care. The agency also filed an application for a protective custody warrant, which the court issued that day. A.C. was removed from her parents' home and placed in Polinsky Children's Center (Polinsky).

The detention hearing was held the following day. The court appointed counsel for Michael, Melody and A.C., made a prima facie finding on the allegations of the petition and detained A.C. in out-of-home care. The court ordered liberal, supervised visits for Michael and reasonable, supervised visits for Melody. Based on findings in A.C.'s earlier dependency proceeding, the court also found that the ICWA applied and ordered the Agency to provide notice to A.C.'s tribe, the Chickasaw Nation. The court set the jurisdiction and disposition hearing for the following month.

In the jurisdiction and disposition report prepared by the Agency's social worker, the Agency recommended that A.C. remain in out-of-home care until Melody could manage her mental health and remain sober and Michael could demonstrate his understanding of the need to protect A.C. from Melody. The social worker reported that Michael claimed that Melody's mental health problems did not affect A.C. and that he

5

denied that Melody had used drugs prior to her recent hospitalizations.[5] He told the social worker that he loved Melody and that it was difficult to keep A.C. from her. Michael declined to drug test and was defensive about Melody's accusations that he was using drugs.

With respect to A.C., the social worker's report recounted continued disturbing behavior by A.C. at Polinsky. She did not play with other children and her behavior frightened them. A.C. cursed frequently and strangled stuffed animals, on one occasion stating "kill me now I want you to put a pencil through my throat and watch the blood squirt out. Kill me now."

At the jurisdiction and disposition hearing, Michael denied the allegations in the petition and sought to regain custody of A.C.[6] The case was set for trial. The Agency requested a continuance to allow time for a psychological evaluation of A.C. Before the trial, the Agency filed an amended petition adding an allegation under section 300, subdivision (c), that A.C. was suffering or at substantial risk of suffering serious emotional damage because she had no parent or guardian capable of providing appropriate care. Specifically, the amended petition alleged that A.C. suffered from mental illness, as evidenced by her sexualized and aggressive behavior, which required mental health treatment that her parents had failed to provide.

---

[5] Melody had been hospitalized earlier that year after another methamphetamine induced psychosis.

[6] Melody denied the allegations of the petition, but does not join in this appeal.

The amended petition was filed after the Chickasaw Tribe was permitted to intervene. The amended petition was accompanied by an addendum report from the Agency that included the declaration of the tribe's representative, Regina Frye. Also before trial, the Agency's social worker submitted addendum reports describing her interviews with A.C.'s teacher and school social worker and the report of the psychologist's evaluation of A.C. A.C.'s teacher noted positive changes in A.C. since her removal from her parents' custody. The psychologist's report recounted odd behavior by A.C., both as described by others and in his own interactions with her. Although the psychologist was hesitant to diagnose psychopathology because A.C. was so young and was also hyperactive, he believed that it was possible that A.C. suffered from mental illness.

The trial was conducted on February 20, 2013 and March 1, 2013. Michael testified that he was not aware of much of A.C.'s behavior that formed the basis for the Agency's concern over her mental health. He testified that he thought her statements and behaviors had been taken out of context and that she was merely repeating things that she had seen in cartoons. He admitted that imagery from Melody's religion, Jehovah's Witness, was a factor in some of A.C.'s behavior. He believed, however, that any emotional problems that A.C. might have were the result of her being removed from his care. He denied that he used drugs and testified that he was employed full time, owned a vehicle and had the resources to care for A.C. He also stated that he was involved in A.C.'s school and said that he had been proactive in placing A.C. in therapy, beginning when she was three years old, to address Melody's absence from her life.

7

With respect to his ability to protect A.C., Michael stated that he would not allow Melody to see A.C. until a court determined that she could. He testified that he was in therapy and now understood his responsibility to ensure that Melody was not in A.C.'s life until "she has made the efforts necessary to reunite with her daughter . . . ." He explained that he had cancelled the protective order against Melody because it was very difficult for him to keep Melody from her daughter, but said that he now appreciated that he could not allow Melody to be part of A.C.'s life.

At the conclusion of the trial, which also included the testimony of the Agency's social worker, Frye and the psychologist who evaluated A.C., the court made true findings on the petitions and declared A.C. a dependant of the court. The court removed A.C. from her father's care, found that it would be detrimental to place A.C. with her mother, and placed A.C. in foster care. The court found beyond a reasonable doubt that, based on Frye's declaration and trial testimony, continued care of A.C. by her parents was likely to result in serious emotional or physical damage and that there was good cause to depart from the placement preferences set forth in the ICWA. The court also found by clear and convincing evidence that active efforts had been made to provide remedial services and rehabilitative programs to prevent the breakup of an Indian family, but that those efforts had thus far been unsuccessful. The court ordered reunification services for the parents.

The court also commented on the evidence pertaining to Michael's ability to protect A.C. from Melody, noting "[t]he father is in a very unfortunate situation, his wife suffers from mental illness. . . . He loves the mother, we don't have control over our

8

emotions. . . . He loves his daughter, I have no doubt about that. I think that his emotions have caused him to make bad choices with regard to his daughter. That is where the reunification services have to come in. He is going to have to do things that he doesn't emotionally agree with to protect his daughter. . . . It is not that I don't believe him, I need some history. . . . I think if you wholeheartedly engage in these reunification services there is no reason this shouldn't be a case that results in some early type of reunification." The court's minute order states, "[B]ased on the progress of the parents in complying with the case plan, it appears the child will be returned home by [the] next review hearing." The court set that hearing for August 28, 2013.

DISCUSSION

I

Michael challenges the sufficiency of the evidence to support the court's dispositional order. He asserts that there was no evidence that removing A.C. from his custody was necessary to protect her from harm, and claims that there were reasonable alternatives to removal.

Before the juvenile court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) The court's jurisdictional findings, which Michael does not dispute, are prima facie evidence the child cannot safely remain in the home. (§ 361, subd. (c)(1).) The parent need not be dangerous and the child need not have been

9

actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136; *In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.) In determining whether removal is warranted, the court may consider the parent's past conduct as well as present circumstances. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) The juvenile court has broad discretion in crafting dispositional orders to protect a child. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

We review the court's dispositional findings to determine whether they are supported by substantial evidence. (*In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654.) We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Michael asserts that rather than removing A.C. from his care, the court could have ordered informal services and stringent supervision by the Agency, with a warning that if there were another incident of concern, that would result in his loss of custody. Alternatively, Michael contends that the court could have declared A.C. a dependent child, but placed her with him and ordered that services be provided. Our review of the

record shows that there is substantial evidence to support the court's finding that A.C. should be removed from Michael's custody.

Michael admitted to cancelling the protective order that was issued against Melody after she threatened his life in front of A.C. He testified that it was difficult for him to keep A.C. from her mother, and the evidence showed that before A.C. was removed from Michael's custody, he permitted Melody to see A.C. As a result, A.C. was exposed to domestic violence between her parents, including her mother pointing a gun at her father, and Melody's drug use and resulting unstable and threatening behavior. Although Michael testified at trial that he was now committed to protecting A.C. from Melody, this was a very recent change. Just three months earlier, Michael stated that he loved Melody and that he wanted to remain in a relationship with her. Michael had the opportunity to keep A.C. from Melody in the past but failed to do so. Until Michael participated in further treatment, returning A.C. to his care would mean putting her back into the same environment that triggered the Agency's involvement.

In sum, the evidence was sufficient to support the court's finding that there were no reasonable means to protect A.C. without removing her from Michael's custody.

## II

Michael also asserts that there is not substantial evidence to support the juvenile court's finding that the Agency made active efforts to prevent the breakup of his Indian family. The ICWA requires that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative

11

programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d).) By requiring "active efforts," Congress intended "to rectify the nonprovision of *any services* to Indian families." (*In re Michael G.* (1998) 63 Cal.App.4th 700, 711, italics added.)

The Agency has the burden to prove by clear and convincing evidence that active efforts were made to prevent the breakup of the Indian family. (*In re Michael G.*, *supra*, 63 Cal.App.4th at p. 712.) The statute does not define "active efforts," and no formula exists for distinguishing active efforts from efforts that are merely passive. (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1286-1287.) The following has been suggested, however, as a useful guideline: " 'Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.' " (*Id*. at p. 1287, quoting *A.A. v. State* (Alaska 1999) 982 P.2d 256, 261.)

"What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe." (§ 361.7, subd. (b).) Services must include the use of available resources of the extended family, the tribe, Indian social services agencies and Indian care givers. (*Ibid.*) On review, this court determines whether substantial evidence supports the court's findings of active efforts. (*In re Michael G.*, *supra*, 63 Cal.App.4th at pp. 715-716.) We must " 'uphold the trial

court's findings unless it can be said that no rational factfinder could reach the same conclusion. [Citation.]' [Citation.]" (*Ibid.*)

We agree with the Agency that there is substantial evidence to support the court's finding that active efforts, within the meaning of the ICWA, were made to prevent the breakup of the family. After the Agency reentered the family's lives following A.C.'s earlier dependency, Michael obtained a restraining order against Melody with the Agency's involvement. Based on that protective order and his agreement to keep A.C. from her mother, the investigation was closed. However, Michael cancelled the order and allowed Melody to see A.C. After A.C.'s removal in November 2012, Michael continued with therapy and the Agency supported his decision to see a therapist at the Indian Health Center. The Agency provided Michael with the opportunity to submit to a random drug test. Michael was also provided with liberal visitation with A.C., as well as referrals to counseling, substance abuse treatment, parenting classes and domestic violence services. At the time of the court's disposition determination, these efforts were continuing. In light of these facts, there is substantial evidence to support the court's finding.

Finally, we reject Michael's contention that tribal representative Frye's declaration disputed that "active efforts" had been made to reunite A.C. with Michael. In her declaration, under the heading "Family Reunification Efforts/Outcome Regarding Relatives," Frye states, "Reasonable efforts were made by the San Diego County to prevent and/or eliminate the need for [A.C.'s] removal from the home." Frye goes on to list the specific services that the Agency had provided. Under the heading "Tribal

13

Position as to the Minor," Frey states "the Chickasaw Nation would respectfully request that active efforts be made to reunite the child . . . with her parents." We disagree with Michael's contention that these statements evidence an opinion that there had not been active efforts to reunite A.C. with her parents.[7]

To the contrary, in her declaration Frye states that the tribe supported the Agency's recommendation that A.C. not be placed with Michael. She expressed her view that "continued custody of this child with her parents . . . would result in serious emotional, physical and/or mental harm" and recommended that A.C. remain at Polinsky for the time being. Frye reiterated this opinion at trial. Contrary to Michael's contention on appeal, Frye's request for continued "active" reunification efforts does not negate her statements concerning the Agency's efforts. Frye's statements support the juvenile court's finding that active efforts had been made.

DISPOSITION

The order is affirmed.

---

[7]    We decline to address Michael's request in his reply brief that we reject the Agency's "assertion that the 'active efforts' requirement found in the [ICWA] and related state law is equivalent to the 'reasonable efforts' requirement applicable in" non-ICWA juvenile dependency proceedings. Even if there is a difference between the two standards, we conclude that the evidence presented in this case constitutes substantial evidence under both.

14

                                          _____
                                                          AARON, J.

WE CONCUR:


_____
        HALLER, Acting P. J.


_____
        McDONALD, J.