134 Cal.App.3d 530 (1982)
184 Cal. Rptr. 778
In re JAMIE M. et al., Persons Coming Under the Juvenile Court Law.
SAN JOAQUIN COUNTY DEPARTMENT OF PUBLIC ASSISTANCE, Plaintiff and Respondent,
v.
BARBARA O., Defendant and Appellant.
Docket No. 20840.
Court of Appeals of California, Third District.
July 30, 1982.
*533 COUNSEL
Joan G. Poulos, under appointment by the Court of Appeal, for Defendant and Appellant.
Gerald A. Sherwin, County Counsel, and George H. Cunningham, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
CARR, J.
On May 28, 1981, the Juvenile Court of San Joaquin County adjudged the minors Jamie M. and Emma M. to be dependent children of the court (Welf. & Inst. Code, § 300, subd. (a)) and ordered them removed from the custody of their mother, Barbara O.[1]
The mother appeals, contending: (1) insufficient evidence to support the order removing the children from parental custody; (2) the allegations of the charging petition were not sufficiently clear to allow appellant to defend against them; (3) the juvenile court did not comply with rule 1376 of California Rules of Court, by establishing a reunification plan; and (4) internal inconsistencies in the findings defeat any meaningful six-month review of the court's order.
*534 We find the order awarding custody of Jamie and Emma to the county department of public assistance to be unsupported by substantial evidence. We shall therefore reverse the dispositional order. We do find, however, that there is evidence in the record to support the juvenile court's finding that Jamie and Emma were dependent children within the meaning of section 300, subdivision (a). We shall remand the matter to the juvenile court for further dispositional proceedings.

1. The Facts

Appellant has a longstanding paranoid schizophrenic illness. When she is ill she feels she and her children are threatened and may become loud, irritable and irrational. When she is on her medication, however, she is rational and pleasant. Because of her need for medicine, appellant recognizes she will have to be under psychiatric care for the rest of her life.
On January 28, 1981, appellant came to the Stockton Police Department with her two children, Jamie (5 years) and Emma (10 months). She asked the police to place the children in protective custody and told police she was afraid of her "common law" husband for various reasons.
The police were unable to place the mother and children together and suggested temporary arrangements. Appellant initially refused, but later agreed when the officer told her it was just for the night.
Appellant went with an officer to the county dependent children's facility. As they were filling out forms necessary for the temporary placement, appellant changed her mind. A disagreement ensued with appellant angrily insisting the children were not going to stay there. The officer decided the children were going to remain, and as appellant attempted to leave with the children the younger child was taken from her. From that time to the present, the mother has not had custody of the children.
Following the jurisdictional hearing appellant moved to a location four blocks from Stockton State Hospital. She sees a psychiatrist every two weeks and has returned to a program of medication. Her finances are to be temporarily managed by hospital staff.

*535 2. The Dispositional Hearing

A dependency proceeding under section 300 is essentially a bifurcated proceeding. The court first determines whether the minor is a dependent child subject to the jurisdiction of the court within the description set out in section 300. In the present case it was alleged the minors were "in need of proper and effective parental care or control and [have] no parent or guardian, or [have] no parent or guardian willing to exercise or capable of exercising such care or control, or [have] no parent or guardian actually exercising such care or control." (§ 300, subd. (a).)
Once the court has determined the minor is a person described by section 300 and has assumed jurisdiction it "shall then proceed to hear evidence on the question of the proper disposition to be made of the minor...." (§ 356.) This dispositional hearing may be continued for a limited time to allow the court to receive the social study of the probation officer or case worker and other evidence the court deems necessary to an informed disposition. (§§ 356, 358.) (1) Before a dispositional order which awards custody to a nonparent without the consent of the parents can be rendered, there must be a clear and convincing showing an award to the parents would be detrimental to the child and that an award of custody to a nonparent is essential to avert harm to the child and required to serve the best interests of the child. (In re B.G. (1974) 11 Cal.3d 679, 699 [114 Cal. Rptr. 444, 523 P.2d 244]; Civ. Code, § 4600, subd. (c).)
The juvenile court made the requisite finding that an award of custody to Barbara would be detrimental to the children.
(2a) Appellant contends there is insufficient evidence to support the finding that the best interests of the children would be served by removing them from their parents' custody. We agree.
The court in the present case made a finding "that an award of custody to a parent would be detrimental to the child" as required by Civil Code section 4600, subdivision (c). A mere recitation, however, of the words of the statute is insufficient to sustain an order awarding custody to a nonparent.
The finding of detriment to the child is more than a procedural nicety which must be observed. It is the basis upon which state intervention *536 into the familial relationship is justified. The finding cannot be a mere recitation to satisfy a statutory hurdle. There must be a "clear showing that such award is essential to avert harm to the child." (Italics added.) (In re B.G., supra, 11 Cal.3d 679, 699.) (3) The standard of proof required to support a finding of detriment which results in the severance of the parent-child relationship is clear and convincing evidence. (In re Christopher B. (1978) 82 Cal. App.3d 608, 617 [147 Cal. Rptr. 390].)
The evidence before the juvenile court on which it could base its dispositional order included the testimony of the various witnesses: appellant; the police officer Barbara initially contacted; Barbara's mother; and the social worker. The written evidence included the social worker's report, and the letters of the children's pediatrician and a physician from the San Joaquin County Acute Psychiatric Unit.
The social study presented by the case worker details the incident which led to the filing of the instant petitions. A phone call from Barbara's mother indicated she felt Barbara had stopped taking her medicine, and had failed to keep followup appointments with a psychiatrist she had been seeing. The case worker called Barbara, who related a "bizarre" story of the husband's harassment, wherein Barbara alleged her husband had removed all her clothes while she was unconscious and had taken pictures of her having sex with a dog. The father had then allegedly shown these pictures to several people. The social study further indicated that Barbara had failed to keep an appointment with a psychiatrist arranged by the case worker.
The study revealed Barbara had been admitted to the Stockton State Hospital on three separate occasions: In 1968, when her two older children were declared dependents of the court and removed from her custody; in 1975, when Jamie was a baby, Barbara was voluntarily admitted for 72 hours. Jamie was returned to her custody when she left the hospital. The third admission, again apparently voluntary, was between the jurisdictional and dispositional hearings in the present case.
The study notes further that the minors, aged one and five years, after some initial difficulty, have adjusted to their foster homes and do not appear to suffer from any serious health problems. The social worker attempted to contact Barbara while she was in the hospital but because of her alleged disorientation and agitation no statement was taken from her. A psychiatric social worker reported Barbara was apparently *537 going to be hospitalized indefinitely (although she was subsequently released prior to the dispositional hearing after having made a rapid recovery).
(2b) The evidence before the juvenile court judge at the time of the dispositional order can be summarized as follows: Barbara had a chronic schizophrenic illness which would manifest itself in the form of paranoid delusions. Drug therapy was, however, very effective in controlling her illness. The delusions suggested in the present petitions were doubtless because of her failure to maintain her drug therapy. Barbara had been hospitalized three times for her illness, the first having occurred thirteen years previously, the second a brief, voluntary admission and the third time a voluntary admission of approximately one or two months following the jurisdictional hearing. The children were apparently healthy and Barbara had never mistreated them physically. At the time of the dispositional hearing Barbara was rational and coherent. She was under psychiatric care on outpatient status and had returned to her drug therapy.
The conclusion drawn from this evidence by the social worker and presumably concurred in by the juvenile court judge was that Barbara was "not responsible enough or emotionally capable of providing the appropriate home environment that the minors need." It is upon this conclusion the juvenile court apparently based its finding that returning custody to Barbara would be detrimental to the minors.
The basic premise of the juvenile court's order is that a schizophrenic parent will per se be detrimental to a child, as no evidence was presented to show how Barbara's illness would adversely affect her children. Assuming the mother's chronic schizophrenia, the question is whether this per se inference of detriment to her children is justified.
The problem with drawing inferences from the diagnosis of "schizophrenic" is that schizophrenia is not a well-defined or well-understood condition. It is rather, a broad grouping[2] of disorders characterized by *538 the occurrence of one of a variety of symptoms in an individual. The most frequent symptoms include unrealistic thinking, severe anxiety, excessive suspiciousness, perplexity or confusion, social withdrawal, auditory hallucinations, overactivity, a feeling of impending doom and generalized motor inhibition.[3] There are many other symptoms, but it is clear that not all need be present for a diagnosis of schizophrenia. In fact, because these symptoms are merely characteristic, the presence of only one of the primary symptoms is necessary to establish the diagnosis.[4] This had led to a wide disparity among diagnosticians as to the exact nature of schizophrenia. Nor will two psychiatrists always agree on a specific diagnosis.[5] Some researchers note that even when the diagnosis of schizophrenia is made, it tells one very little about the subject's condition. Because it may represent a collection of parts from several types of emotional disturbances rather than a single "`disease'; labeling some patients as schizophrenic may be equivalent to saying an accident victim with a concussion, factured spine, broken ribs and a collapsed lung is `severely ill.'"[6]
Moreover, there is not universal agreement in the cause of schizophrenia. A wide variety of theories have been advanced on the issue. It has been postulated that the cause may be hereditary,[7] viral,[8] or the result of environmental factors,[9] which are physiologically manifested by an imbalance of brain chemicals or brain structure abnormalities.[10] *539 "Schizophrenia has so diverse a patterning from patient to patient that it is hard to see how one universal physiological or biological cause can be applied to it."[11]
To further complicate matters, there is wide disagreement over the existence of a proper cure for the disorder, undoubtedly due to the wide range of symptoms the disorder can display, and the lack of a thorough understanding of its causes. Psychotherapy or psychoanalysis is widely used as a treatment, although its practitioners reveal profound differences in conception and execution.[12]
Although treatment with antipsychotic drugs is widespread,[13] there is no certainty drug therapy will be successful. The studies indicate that use of an antipsychotic drug will generally result in an improvement that a psychiatrist would notice.[14] There is difficulty, however, in reaching a consensus on what constitutes "improvement" and whether this improvement will remain after the patient is released from the controlled therapy.[15] Moreover, numerous side effects of varying degrees of seriousness can accompany drug therapy.[16]
Once drug therapy has resulted in sufficient improvement as to lead to outpatient status, a significant number of patients find themselves later rehospitalized.[17] This phenomenon of returning to the hospital (sometimes called the "revolving door syndrome") has been attributed to several causes. One hypothesis is that the patient returns because he or she has been made dependent on the hospital by the hospital process itself, which is designed to isolate the individual and make him or her a part of the hospital social structure.[18] The patient may also return because of failure to maintain the drug therapy for reasons varying from simple neglect, to a conscious, deliberate decision.[19] A relapse is not, *540 however, a foregone conclusion for every outpatient. In the Hogarty, Goldberg study,[20] two-thirds of the patients remained independent of the hospital for two years after therapy, including 20 percent of those whose therapy consisted entirely of taking a placebo.[21] This indicates that the vagaries of the disorder and the random situational factors in each case mean prediction of future behavior in any generalized sense, including rehospitalization, is difficult at best.
Before the court was a diagnosis of a disorder which has been intensely researched and yet remains little understood. Barbara is a diagnosed schizophrenic who has apparently had several active delusional episodes. This does not disclose the cause of her disorder, nor indicate its severity. The mere fact she is labelled a schizophrenic really tells us very little about her behavior and its affect on her children. How then is a court to use this crucial and yet nebulous diagnosis in ruling on the proper disposition to be made of her children? It would appear that a diagnosis of schizophrenia should be the court's starting point, not its conclusion. Rather than mandating a specific disposition because the mother is schizophrenic, the diagnosis should lead to an indepth examination of her psychiatric history, her present condition, her previous response to drug therapy, and the potential for future therapy with a focus on what affect her behavior has had, and will have, on her children.
Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be "infected" by the parent.[22] The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety. Other jurisdictions have recognized that the evidence must reveal a detriment to the child resulting from the mother's illness before removal is justified. (See State in Interest of E. v. J.T. (Utah 1978) 578 P.2d 831, 834; see also Annot., Mental health of contesting parent as factor in award of child custody (1960) 74 A.L.R.2d 1073, 1085 et seq.)
*541 The court should examine each factual situation to determine what type of detriment might result and not impose its set of values as to what constitutes a "good home environment" on a family who may not subscribe to those same values. (4) There is no national consensus on how to raise a "healthy" adult, and a juvenile court should examine the question of parental custody from the child's view point. (In re David B. (1979) 91 Cal. App.3d 184, 196 [154 Cal. Rptr. 63].) Often the harm created by removing a child from its parents may be more serious than the harm which the state intervention seeks to prevent (Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards (1975) 27 Stan.L.Rev. 985, 994; hereafter cited as A Search for Realistic Standards) because the courts lack the ability to insure that the placement is superior to the child's own home.[23] Moreover, children in foster care experience the anxiety of identity problems and conflicting loyalties caused by having three sets of adults with a stake in caring for them. (The foster parents, the natural parents, and the social workers.) (A Search for Realistic Standards at p. 995.) The children may also be harmed by viewing the placement as punishment for some unknown thing they have done wrong. The court should recognize that "`[t]he concensus of expert opinion holds that it is most important to avoid multiple placements for children between six months and three years of age. Each additional placement may retard the development and may impair their ability to form lasting attachments.'" (In re David B., supra, 91 Cal. App.3d at p. 196; citing Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights (1976) 28 Stan.L.Rev. 625, 695.)
Although balancing these two potential harms may be difficult, "[t]he juvenile court is constantly faced with the necessity of choosing on behalf of a child, the best of several not entirely satisfactory alternatives. It is seldom possible to make such a choice on the mechanical basis that the proof of some particular fact `ipso facto' calls for a predetermined response." (In re A.J., supra, 274 Cal. App.2d at p. 202.) (2c) It cannot be presumed that a mother who is proven to be "schizophrenic" will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less then socially acceptable and yet they are loving and compassionate parents. Conversely, *542 there are parents who always exhibit socially acceptable behavior publicy, but whose children have parent-induced psychological and emotional problems their entire lives. The trial court's duty in this situation is to examine the facts in detail. The social worker must demonstrate with specificity how the minor has been or will be harmed by the parents' mental illness. (See 2 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) Jurisdictional Hearing, § 18.28, p. 120.) The court must then weigh the evidence of the harm which will be caused the children if they remain in parental custody against the harm caused by placing the children in foster care. Only after this balancing has taken place, based on all the available evidence, can the court make an informed decision which can be said to be truly in the best interests of the children.
In the instant case, we find no evidence of how Barbara's mental illness would adversely affect her children. The evidence disclosed only that the children experienced some difficulty adjusting to foster care but were in all other respects healthy and normal. It was uncontested that Barbara had always been a good mother to Jamie and that the children's pediatrician found them to be well taken care of. Against this evidence the juvenile court had the testimony of various witnesses of Barbara's delusions and a letter from a psychiatrist containing a diagnosis as a schizophrenic and a statement that Barbara had rapidly recovered from her most recent episode and was on outpatient status.
On this evidence any finding of detriment to the children must be based on the assumption that a schizophrenic parent is ipso facto an unfit parent. Such an assumption is not warranted by the law or the facts.

3. The Jurisdictional Hearing

Appellant also contends there is insufficient evidence to support the juvenile court's finding that Jamie and Emma were dependent children within the meaning of section 300, subdivision (a). The juvenile court found there was "clear and convincing" evidence to support its conclusion.
Although the matter of the standard of proof to be applied at the jurisdictional hearing is not entirely free from doubt, no error occurred through application of the more stringent standard.[24] (5) The issue *543 before us, therefore, is whether substantial evidence supports the finding that Jamie and Emma were minors "in need of proper and effective parental care or control and [who have] no parent or guardian willing to exercise or capable of exercising such care or control, or [have] no parent or guardian actually exercising such care or control." (§ 300, subd. (a).) As noted ante, we are directed to indulge all reasonable inferences to support the findings, and view the record in the light most favorable to the jurisdictional order. (In re Luwanna S. (1973) 31 Cal. App.3d 112, 114 [107 Cal. Rptr. 62].) We find there was substantial evidence presented to support such a finding.
It is clear that when Barbara brought the children to the police she was seeking help in protecting them. Whether the alleged dangers were real or imagined is unclear. It is probable, however, that her fears for the children's safety were a result of Barbara's failure to maintain her program of medication. From the allegations presented in the charging petition[25] it was reasonable for the trial court to infer that at the time of the alleged events, Barbara was either unwilling or unable to provide proper and effective parental care or control. This inference is supported by the evidence of her emotional problems, her need for medicine to maintain her psychological equilibrium and her actions in bringing the children to the police.
Having properly assumed jurisdiction over the children, the juvenile court was presented with innumerable options short of terminating custody. (See, e.g., In re Jeannette S. (1979) 94 Cal. App.3d 52, 58-61 [156 Cal. Rptr. 262].) The court could have placed conditions on Barbara's continued custody of the children, such as participation in a counseling program, to ensure that these events would not reoccur. (Cal. Rules of Court, rule 1376(b).) The court could have mandated *544 the county department of public assistance to supervise appellant's home situation to oversee her continued medical treatment and proper financial management.[26] (Ibid.) By taking jurisdiction to supervise Barbara's activities with respect to Jamie and Emma it was possible for the juvenile court to truly serve the best interests of the children by providing a stable, supervised home environment with their natural parent instead of penalizing all three for the mother's acknowledgement of her problems.

4. Appellant's Remaining Contentions

(6) Appellant further contends the allegations of the charging petition were not sufficiently clear to provide her with specific facts upon which the termination of parental custody was predicated. (See In re Jeremy C. (1980) 109 Cal. App.2d 384 [167 Cal. Rptr. 283].)
Appellant is correct as to the dispositional order. The petition alleges no facts giving notice to appellant of the manner in which her continued custody might be detrimental to the children. Having determined that the finding of detriment is not supported by substantial evidence, it is unnecessary to further address this contention.
The contention is also applicable to the dependency finding. The parent must be given notice of the specific facts upon which the petition is based to enable her to meet its allegations. However, this case is distinguishable from In re Jeremy C. in that here there was more than the mere conclusionary words of the statute. (In re Jeremy C., supra, 109 Cal. App.3d at p. 397.) The petition alleged Barbara's actions and statements in seeking protective custody for the children. These facts give rise to an inference that at that time Barbara was unwilling or unable to provide proper care and control for the children due to her emotional problem. Sufficient notice was provided to allow appellant to defend against these allegations.
(7) Appellant next alleges a failure to comply with California Rules of Court, rule 1376 as to presentation and consideration of a reunification plan prior to a dispositional order which awards custody to a *545 nonparent. Failure of the probation officer or social worker to formulate and recommend such a plan is unquestionable error. (In re Jeremy C., supra, 109 Cal. App.3d at pp. 392-393.)
The augmented record reveals the social worker's report did recommend the parents fulfill numerous conditions prior to any reunification with the children. These conditions were adopted verbatim by the juvenile court in its dispositional order as prerequisites to reunification.
As we shall reverse the dispositional order on other grounds, it is not necessary to determine whether these conditions were a satisfactory "plan for reuniting the minor with the family" as required by California Rules of Court, rule 1376(b). (8) For the guidance of the trial court, however, we note that the reunification plan as required by rule 1376 is a crucial part of a dispositional order which removes any child from the home. The purpose of the requirement is to create a plan to reunite the family in a situation where the best interests of all concerned, the child, the parent and society as a whole, are well served.
Before such a plan can be successfully implemented, the parents must be given notice of the conditions which they are to meet. Rule 1376 contemplates that the plan shall be "furnished to all parties," received in evidence (for the benefit of the reviewing court as well), "read and considered" by the juvenile court, and "discussed with the parents" where appropriate.
Appellant's final contention, although unnecessary for resolution of this appeal, merits discussion. The reunification plan must be internally consistent and have as its objective the provision of such services or counselling as will lead to the resumption of a normal family relationship.
In the present case, numerous conditions were placed on both appellant and the father with a duration of one year. (e.g., mother's participation in psychotherapy, maintenance of a "stable home environment" for both.) The matter was scheduled, however, for a six-month review. Appellant questions how meaningful this review could be. We echo that concern. It is possible the juvenile court's intent was merely to have an opportunity to ascertain whether the conditions precedent to reunification were being fulfilled. If this was the intent, it is laudable. The court should have, however, explained the purpose of this mid-course review to the parents, to avoid potential confusion and anxiety *546 resulting from being given conditions taking a year to fulfill but for which one's performance is to be judged in six months.
The judgment is reversed as to the dispositional order placing Jamie M. and Emma M. in the custody of the department of public assistance. The trial court is directed to conduct another dispositional hearing in accordance with the principles expressed herein.
Evans, Acting P.J., and Dozier, J.,[*] concurred.
On August 31, 1982, the opinion was modified to read as printed above.
NOTES
[1] Hereafter, all references are to the Welfare and Institutions Code unless unless otherwise noted.
[2] The American Psychiatric Association presents the following definition of schizophrenia: "This large category includes a group of disorders manifested by characteristic disturbances of thinking, mood and behavior. Disturbances in thinking are marked by alterations of concept formation which may lead to mis-interpretation of reality and sometimes to delusions and hallucinations, which frequently appear psychologically self-protective. Corollary mood changes include ambivalent, constricted and inappropriate emotional responsiveness and loss of empathy with others. Behavior may be withdrawn, regressive and bizarre. The schizophrenics, in which the mental status is attributable primarily to a thought disorder, are to be distinguished from the major affective disorders which are dominated by a mood disorder. The paranoid states are distinguished from schizophrenia by the narrowness of their distortions of reality and by the absence of other psychotic symptoms." (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968).)
[3] Dubose, Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment? (1976) 60 Minn.L.Rev. 1149, 1180 (hereafter referred to as Dubose).
[4] Lopez-Ibor, The Delusional Schizophrenic Mutation, in Schizophrenia as a Lifestyle (1974) page 9.
[5] Ennis and Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom (1974) 62 Cal.L.Rev. 693, 702.
[6] Note, Drug-resistant Schizophrenia? (Feb. 23, 1980) 117 Sci. News 117.
[7] Sobel, Children of Schizophrenic Parents: Preliminary Observations on Early Development (1961) 118 Am. J. Psych. 512.
[8] Note, Evidence for a Schizophrenic Virus (May 19, 1979) 115 Sci. News 325.
[9] Lidz et al., Schizophrenia And The Family (1965) page 430.
[10] Note, The Schizophrenic Brain: Rewriting The Chapter (July 14, 1979) 116 Sci. News 26.
[11] Burton, The Alchemy of Schizophrenia, in Schizophrenia as a Lifestyle (1974) page 41 (hereafter referred to as The Alchemy of Schizophrenia).
[12] The Alchemy of Schizophrenia, supra, at page 85.
[13] Dubose, supra, at page 1169.
[14] Dubose, supra, at page 1176.
[15] Dubose, supra, at pages 1178-1180, 1198.
[16] Dubose, supra, at pages 1202-1209.
[17] Dubose, supra, at pages 1207-1208.
[18] Chambers, Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives (1972) 70 Mich.L.Rev. 1107, 1127-1133.
[19] It is interesting to note that the relapse rate of patients on drug therapy appears to refute the idea that drug therapy is something the patient would choose if he or she were competent. The drug supposedly renders the patient competent, yet in one study over one-third of those competent decisions were to stop taking the drugs. See, Dubose, supra, at page 1208, citing Hogarty et al., Drug and Sociotherapy in the Aftercare of Schizophrenic Patients: One Year Relapse Rates (1973) 28 Arch. Gen. Psych. 54 (hereafter Hogarty, Goldberg).
[20] See footnote 19.
[21] Hogarty, Goldberg, see footnote 19.
[22] See, Malmquist, The Role of Parental Mental Illness in Custody Proceedings (1968) 2 Family L.Q. 360, 369.
[23] "`A juvenile court may possess no magic wand to create a replacement for a home which falls short of ideal.'" (In re A.J. (1969) 274 Cal. App.2d 199, 202 [78 Cal. Rptr. 880].)
[24] See, e.g., In re Jeremy C. (1980) 109 Cal. App.3d 384, 394, footnote 10 [167 Cal. Rptr. 283], where in similar circumstances we noted that application of the clear and convincing proof standard was permissible, although only a preponderance of the evidence was required for a jurisdictional finding within section 300. (See § 355.) See also In re Christopher B., supra, 82 Cal. App.3d 608, holding that clear and convincing proof is required in a section 300 dependency proceeding only when the final result is to award custody to a nonparent.
[25] Each petition alleged the following facts: "That said minor has no parent or guardian actually or capable of exercising proper and effective parental care or control and said minor is in need of such care or control in that on or about the 28th day of January, 1981, at and in the County of San Joaquin, State of California, the minor's mother requested that said minor be placed in protective custody. Further, the minor's mother stated that the minor's father harasses her and has threatened to take the subject minor from her due to her emotional problems. In addition, the minor's mother is afraid the minor's father or other unknown persons may attempt to harm the minor."
[26] The trial judge apparently thought the best course was to put the children in a foster home to see if the mother would continue her medication. The court may have been right in deciding that continuation of the medication was crucial but there was no evidence that it was necessary to take the children from the mother during this period when her taking of the medication could be monitored by the welfare social worker.
[*] Assigned by the Chairperson of the Judicial Council.