Filed 4/8/14  In re S.A. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re S.A., a Person Coming Under the Juvenile Court Law. | B248697 |
| | (Los Angeles County Super Ct. No. CK97629) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| CYNTHIA A., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel for Plaintiff and Respondent.

_____

Cynthia A. appeals the juvenile court's jurisdictional findings and dispositional orders concerning her son, S.A. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Cynthia A. gave birth to S.A. in January 2013. Prior to their discharge from the hospital, staff developed concerns about Cynthia A.'s mental health and stability. Although she was behaving appropriately with the baby, Cynthia A. was "highly guarded and suspicious" with others, becoming highly agitated when a doctor came to check on S.A. A staff member had been placed outside the hospital room until Cynthia A. could be assessed by a psychiatrist.

Cynthia A. denied any mental health history but had been hospitalized multiple times for mental health issues. In 2003-2004, she received outpatient services with a diagnosis of bipolar depression with psychotic features. In July 2008, she was hospitalized for psychiatric care for 32 days due to a depressive disorder. She received outpatient services from October of that year until July of 2009, and was prescribed medication. In June 2009, she was hospitalized for 13 days and diagnosed with psychosis. In August 2011, Cynthia A. was evaluated at the psychiatric facility and transferred to a private hospital due to symptoms of depression with suicidal ideation. In the same month, she was again evaluated and transferred to a hospital due to symptoms of depression. In October 2011, she was evaluated once more and transferred to a private hospital because she again had symptoms of depression. From November 2011 to August 2012, she received outpatient services at a mental health clinic. A hospital social worker who had been working with Cynthia A. for some time noted that she had been prescribed psychiatric medication in the past but had not been medication-compliant.

From the maternal grandmother the Department of Children and Family Services (DCFS) learned that Cynthia A.'s psychiatric problems began when she was a teenager. She had made multiple suicide attempts. Although psychoactive medication had stabilized her, Cynthia A. stopped taking her medication "[a]s soon as she would feel better," and then she began experiencing symptoms of mental illness again. The maternal

2

grandmother could not recall all of Cynthia A.'s hospitalizations. The last time Cynthia A. had received mental health services had been in the middle of 2012; she believed that Cynthia A. was diagnosed with paranoia and schizophrenia. Maternal grandmother reported that Cynthia A. continued to be paranoid, hearing voices in her head and accusing the grandparents of trying to kill her pets.

Although Cynthia A. was living at the home of the maternal grandparents, she refused to speak with any family member. She would only communicate through text messages in which she would request fast food and magazines. She isolated herself in her room and kept nonperishable food in a box with her. She failed to follow house rules. The maternal grandmother stated that she was afraid for the baby, asking, "Is she just going to keep the baby isolated in her room and treat him like a cat?" Although there were a few baby items at the house, Cynthia A. did not have any diapers, wipes, or formula at the home. The maternal grandmother told DCFS that she had offered to purchase a crib and other items for the baby, but Cynthia A. refused her assistance. There was a box of diapers at the house; the maternal grandmother had bought them but Cynthia A. would not accept them.

The DCFS social worker interviewed Cynthia A. Cynthia A. denied ever having been in therapy, having been hospitalized, or ever having attempted suicide. When confronted with records of her hospitalization, Cynthia A. admitted having been hospitalized once in 2011; she claimed it was because "my mother didn't like my boyfriend and she was trying to get me to break up with him so she had the police take me away and I went to the psychiatric hospital but they released me right away." The social worker reminded her that she would have had to have been deemed to be a threat to herself or others before she could be hospitalized, and Cynthia A. said that her mother did it because she hates her. The social worker attempted to ask Cynthia A. about her other hospitalizations, but Cynthia A. denied any depression, delusions, paranoia, auditory hallucinations, or self-injury. She continued to maintain that she had been hospitalized only once, but said that if there were any other hospitalizations, she did not remember them and they occurred because her mother called in false reports. The social

worker asked Cynthia A. to be more forthcoming about her mental health; Cynthia A. denied any problems and asserted that she did not need therapy or medication.

The DCFS social worker asked Cynthia A. about the hospital's concern that she would not permit a nurse to perform routine checks on the baby to ensure his health. Cynthia A. denied any such refusal. Cynthia A. claimed that a few hours after delivering the baby, a nurse decided she was spending too long in the bathroom and attempted to pull her off the toilet. According to Cynthia A., a second nurse intervened, but the first nurse "yelled" at her that she was going to call "psych" on her. Ever since then, they had posted a nurse to watch her for no reason.

In addition to the concerns about Cynthia A.'s mental health, another ground for the referral to DCFS had been issues about Cynthia A.'s ability to care for the baby after discharge. Cynthia A. had reported that she intended to return to her parents' home with the baby, but she also reported that the house was unsafe and had black mold growing on the walls. She told a hospital social worker that the maternal grandparents were "crazy" and "do mean things" to her. She reported that the maternal grandfather stood outside her room with an electric saw, cutting down trees for no reason, and that he looked in her window and spied on her. She claimed that the maternal grandmother deliberately grew mold on her food for personal consumption. Cynthia A. also stated that she had no privacy in the home and that there was a curtain on her bedroom door. Cynthia A. did not have a crib or a bassinet for the baby, intended to have him sleep on a nursing pillow, and did not know what a changing table was. The hospital social worker noted that Cynthia A. had "lack of understanding as to a newborn's need," and that it was unclear whether "the cognitive disconnect is due to depression or [if] there is some type of cognitive impairment such as mild [mental retardation]."

The DCFS social worker interviewed Cynthia A. about her ability to care for S.A. Cynthia A. stated that her parents were not supportive, and that she had refused to permit them to see her and the baby at the hospital. When asked about her claim that the maternal grandfather threatened her by cutting trees down, she stated that he knew that she was pregnant and needed rest but would use a table saw in the garage for 12 hours

4

overnight to prevent her from resting. She claimed that he was abusive and domineering, believed he owned everything in the home, hit her as a child and as an adult, and engaged in retaliatory behavior like turning off the power to the home. Cynthia A. repeated her claim that the maternal grandparents' home had black mold growing on the walls and that the maternal grandmother grew it deliberately to eat it. The social worker, who had visited the maternal grandparents' home, asked where the mold was, because she had found none when she inspected the home; Cynthia A. had no response.

Cynthia A. told DCFS that she was planning to return to her parents' home with the baby until she could obtain subsidized public housing. She planned to support the child with her Supplemental Security Income, assistance she claimed to receive because she had autism.[1] Cynthia A. said that she was "looking into" getting a crib. She reported having only one friend she could trust to help her.

During the interview with Cynthia A., the DCFS social worker observed that although S.A. was in a crib next to Cynthia A., she never looked over or checked on him.

The psychiatrist who assessed Cynthia A. in the hospital concluded, "Though [Cynthia A.] currently is appropriate with [the] child in a structured setting and is able to take care of [the] child's basic needs like feeding and changing diapers, she has not been able to communicate a realistic plan for housing and care after hospitalization. She is unable to provide reasons for her refusal to allow nurses to examine her baby. Patient is guarded and denies any psychiatric history or needing any psychiatric help contrary to available psychiatric documentation which states otherwise. The concern is that patient has poor social support and has not established any contact with her parents and may not be able to provide for herself or her child without assistance from her parents and in an unstructured/independent living setting. [¶] Cynthia has an extensive psychiatric history and is not [taking] any psychiatric medications presently or followed by a mental health care provider. She [] has a higher risk of developing postpartum depression or psychosis and hence will require ongoing supervision either by family members or in a professional

---

[1] The hospital social worker confirmed that Cynthia A. was "definitely not autistic."

5

setting." Although Cynthia A. did not meet the criteria for a psychiatric hold, the psychiatrist believed she had a mood disorder and recommended outpatient care, possibly including a mood stabilizer.

DCFS concluded that "there were exigent concerns about the mother's ability to care for the child due to the mother's mental health history, denial of any mental health issues, history of psychiatric medication non-compliance, and her lack of a safe and stable living situation combined with her acrimonious relationship with her parents." Accordingly, DCFS determined that S.A. could not safely remain in Cynthia A.'s care upon discharge from the hospital and would therefore be detained.

The DCFS social worker informed Cynthia A. that the baby would be detained and repeatedly explained the reasons for the detention. Cynthia A. continued to deny any mental health issues and stated that she should not be considered an unfit mother because she failed to purchase a crib. She promised to purchase a crib before the detention hearing. Both the DCFS social worker and the hospital social worker urged Cynthia A. to obtain mental health services before the next hearing, but Cynthia A. responded that there was no need for her to do so because she had no mental health issues. Cynthia A. characterized the psychological evaluation performed on her that day as clearing her of any mental health issues, but the social workers explained to her that while she was not found to meet the criteria to be placed on a psychiatric hold, she was diagnosed with a mood disorder and treatment had been recommended.

Cynthia A. was told that S.A. would be moved to the nursery and that the hospital staff would wait until the following day to discharge her; during that time, she was told, she could visit S.A. as often as she wanted in the nursery with the nurses there as monitors. Cynthia A. said she wanted to be discharged right then because there was no reason for her to stay. At this point, the baby began fussing and making noises, but Cynthia A. did not check on him. The DCFS social worker waited for a few minutes to see whether Cynthia A. would turn her attention to the child, but she did not. The social worker then checked on the baby. She asked Cynthia A. if she would like to change the

6

baby's diaper, but Cynthia A. said that she did not want to, because she needed to get dressed and leave.

At Cynthia A.'s first visit with S.A., the foster parent had to place S.A. in Cynthia A.'s arms because she did not know how to pick up the baby. She was not focused on the child, and instead used the visit to ask the foster parent about the dependency proceedings and whether he was trying to adopt S.A. Cynthia A. told the foster parent that she had been told not to discuss the case with him, but she intended to do so anyway. Several times she had to be redirected to focus her attention on the child. At the end of the visit, the foster parent offered to let her walk with him to his car so that she could spend a few more minutes with the baby. Cynthia A. declined. During monitored visits, the "foster parents and service providers . . . observed that mother requires constant direction and hands-on instruction on how to appropriately hold, feed, and change S[.A.] Although mother is able to redirect, she is unable to retain the skills she learned in previous visits."

DCFS filed a petition alleging that S.A. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[2] section 300, subdivision (b), on the grounds that Cynthia A.'s mental and emotional problems rendered her unable to provide regular care for S.A. and placed him at risk of harm. DCFS further asserted that she had failed to take prescribed medication and to obtain mental health treatment, and that she had been repeatedly hospitalized. Cynthia A. denied the allegation, stating, "All of this is false. Um . . . I have my mother recording threatening me with all this. She said she was going to file allegations saying all this. I have it recorded on my phone because I refused to get an abortion. She used specific terms, something like this; she was throwing out terms and threw out specific terms. This was back in August."

DCFS observed that Cynthia A. has "an extensive history of mental illness and failure to comply with prescribed medication. Furthermore, mother is in complete denial about her mental illness and has refused to take responsibility and address the issue.

---

[2]     All further statutory references are to the Welfare and Institutions Code.

Mother continues to blame the maternal family for the Department's involvement, and appears to have no actual insight or understanding as to why the Department is involved." Further, DCFS noted that Cynthia A. "is so mentally ill that she believes the medical documents [evidencing her prior hospitalizations and treatment] are 'fake' and that there is not, in fact, a mental health issue. The mother clearly has delusional moments as well as on-going paranoia. The mother believes her parents have made the allegations up and reports major discord in that relationship." DCFS further noted that Cynthia A. did not appear to function appropriately for her age, making "bizarre and childish comments" to the investigators that suggested that she might have developmental delays.

Cynthia A. submitted to the juvenile court a letter from a psychiatrist who had interviewed her once and opined that she did not have any disorder that would interfere with her ability to care for S.A. When a DCFS investigator spoke with the psychiatrist, he indicated that they had spoken for 40 minutes and that he had relied on Cynthia A.'s representation of her history, which included no reference to any history of mental illness. When the DCFS investigator shared that information with him, the psychiatrist responded that Cynthia A. had "put on a good act."

The juvenile court found true the allegation of the petition and declared S.A. a dependent child of the court. The court found by clear and convincing evidence that substantial danger existed to S.A. and that there was no reasonable means of protecting him without removing him from Cynthia A.'s custody. Cynthia A. appeals.

## DISCUSSION

### I.     Jurisdictional Findings

We review the juvenile court's jurisdiction and disposition findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Substantial evidence is "evidence which is reasonable in nature, credible, and of solid value." (*Ibid*.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility

8

of the evidence and witnesses.  (*In re Tania S*. (1992) 5 Cal.App.4th 728, 733.)  We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V*. (1992) 5 Cal.App.4th 1201, 1212.)

Cynthia claims that the jurisdictional findings must be reversed because there was not sufficient evidence that her mental health problems caused S.A. to suffer or placed him at a substantial risk of suffering serious physical harm or illness.  She further contends that there was no evidence to support the specific allegation that she was not medication-compliant because there was no evidence that she had a present prescription that she was not taking.

Substantial evidence supports the jurisdictional findings.  Cynthia A. had been hospitalized repeatedly for her significant and profoundly impairing mental health issues, but she steadfastly refused to acknowledge that she was mentally ill or that she needed treatment—even when the DCFS social worker and the hospital social worker advised her that her untreated mental health problems were the basis for the detention of her infant child.  Cynthia A.'s behavior was erratic and paranoid, and although she had not treated S.A. inappropriately in the hospital, she did refuse without justification to permit a nurse to perform a regular check on him.  She had no realistic plan for how to take care of her son, including even the most basic elements of food, diapers, a living place, and sleeping arrangements.  Moreover, Cynthia A. appeared indifferent to or unaware of S.A.'s needs, failing to check on him while he was by her side in the hospital or to respond to him when he cried.  She required constant direction and hands-on instruction in how to hold, feed, and change the baby, and she failed to retain those skills between visits.  Cynthia A.'s mental illness very clearly impacted her ability to care for herself and others; while her condition may not at the time have risen to the level necessary for a psychiatric hold, it impaired her functioning and her ability to provide basic care for her child.

Cynthia A. argues that the jurisdictional findings cannot be upheld because there was no connection between her mental illness and any risk to S.A. We disagree. Harm may not be presumed to a child from the mere fact that a parent is mentally ill (*In re David M.* (2005) 134 Cal.App.4th 822, 830), but the evidence here is of mental illness combined with abject denial of any mental health needs, a direct rejection of recommended treatment, and a lack of ability to care for the child outside a structured or institutional setting. Accordingly, this case is not like *In re David M.*, in which the parents had mental problems but there was no evidence that the mental problems negatively impacted their ability to care for their child. (*Ibid.*) Here, Cynthia A.'s significant psychiatric problems and hospitalizations, combined with her failure to consistently obtain mental health treatment, her denial of her mental health history and present needs, her ongoing paranoid behaviors, and her inability to attend to and learn how to meet the needs of her child, all placed S.A. at risk of harm in her care.

Nor is this case akin to the facts in *In re James R.* (2009) 176 Cal.App.4th 129, on which Cynthia A. also relies. In *James R.*, the mother had a history of mental illness, but she also had stable income and stable housing, and she resided with the children's father, who shared parenting responsibilities with her. (*Id.* at pp. 132-133.) The children were healthy, well cared for, and never unsupervised, and they had not been neglected in the past. (*Id.* at pp. 136-137.) A psychotherapist concluded that she was not a risk to her children. (*Id.* at p. 133.) Because there was no evidence of harm or a specific risk of harm to the children, and because there was no evidence that their father could not protect them, the jurisdictional finding was reversed. (*Id.* at p. 137.) Here, in contrast, Cynthia A. did not have stable housing, a second caregiver competent to protect the child, or any social support. She had provided little for her son and had refused all assistance from the maternal grandparents. Moreover, the psychiatrist who examined her opined that she "may not be able to provide for herself or her child without assistance from her parents and in an unstructured/independent living situation," and that she "will require ongoing supervision either by family members or in a professional setting." As discussed

above, there was evidence that Cynthia A. was not able to provide regular care to her child and that S.A. was at risk in her care.

With respect to the specific allegation that there was no evidence to support the contention that Cynthia was noncompliant with medication regimes, the evidence presented to the court included multiple reports that Cynthia A. had been prescribed psychoactive medications in the past but that she had not continued to take them once she began to improve. While Cynthia A. is correct that there was no evidence that at the time of the jurisdictional hearing she was noncompliant with respect to a presently prescribed medication, that was not the allegation. Instead, DCFS alleged that Cynthia A. had an extensive history of mental illness that she had failed to treat by taking prescribed medication and obtaining mental health treatment. As detailed above, the evidence amply supports that allegation.

## II.    Dispositional Orders

Section 361, subdivision (c) provides that a dependent child may not be removed from the custody of his or her parent unless the juvenile court finds clear and convincing evidence of one of several circumstances, including that there would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor" from the parent's home. (§ 361, subd. (c)(1).) The juvenile court concluded by clear and convincing evidence that Cynthia A. presented a substantial danger to S.A. and that there were no reasonable means to protect him without removal from her custody.

We review the juvenile court's findings for substantial evidence. (*In re J.K.*, *supra*, 174 Cal.App.4th at p. 1433.) Here, the evidence that supports the jurisdictional findings also supports the removal order: Cynthia A. experienced extensive mental health problems; she denied those problems and rejected treatment; she had failed to take prescribed medication; her behavior was indicative of chronic mental health issues; she was paranoid, restricted access to S.A., and was unable to provide care for him without

11

assistance; she refused the assistance available to her from her parents; and she was ill-prepared to recognize and respond to her child's needs.

Cynthia A., however, argues that less restrictive means than removal existed to protect S.A. Specifically, she contends that the court could have ordered family maintenance services and ordered that Cynthia A. remain living with the maternal grandmother and never to be alone with S.A. According to Cynthia A., the fact that she underwent a psychological evaluation pursuant to a court order and signed consent and release forms indicates that she would cooperate with court orders, and the fact that sometimes her parents were able to assist her reveals that she would ultimately accept the help that was offered by them. The record does not bear out the argument that these acts evinced a willingness to accept help and to cooperate with the court. Cynthia A. was so far in denial of her illness that she refused treatment even when advised that the baby was detained because of her untreated and uncontrolled mental health issues. She refused to speak with her parents or permit them to visit the baby in the hospital, and she claimed that she was only going to live with them until she was able to get her own apartment. While Cynthia A. did sit through a 40-minute assessment, she did not disclose her mental health history, leading the resulting assessment to be of little value and the psychiatrist to later observe that she had "put on a good act."

The evidence in the record does not indicate that placement with Cynthia A. with orders that she reside with the maternal grandparents and never be alone with the baby would be sufficient to protect S.A. When at the maternal grandparents' house, Cynthia A. isolated herself in her room and did not follow house rules. She would not speak to the family and only communicated through text messages in which she conveyed her wishes for fast food and magazines. The maternal grandmother feared that Cynthia A. would take the baby into her room and care for him in isolation as though he were a pet. Significantly, the maternal grandmother reported that she was ineffective at setting boundaries or enforcing rules with Cynthia A.: "I am weak, not strong with her," she said. She wanted to help her daughter but reported that she has to be careful about how she interacted with her because if she said anything wrong, Cynthia A. would "shut

12

down" on her. At one point the maternal grandmother, who had been cooperating with DCFS, pretended she had not spoken with DCFS before because, she later explained, she did not want to upset Cynthia A. and cause her to have one of her "episodes." Because Cynthia A. withdrew and isolated herself even in the family home, and because the maternal grandmother was ineffective at setting limits for Cynthia A. and feared upsetting her so much that she would engage in concealment, placing S.A. with Cynthia A. with an order that she reside in the maternal grandparents' home and not be alone with the child cannot be considered a reasonable method of protecting S.A. from the risk posed by Cynthia A.

Cynthia A. argues that the present case is analogous to *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067 and *In re Jamie M.* (1982) 134 Cal.App.3d 530, but the cases are distinguishable. In *Kimberly R.*, the mother "acknowledge[d] having a mental illness" but "manage[d] it with medication and psychiatric and psychological supervision" such that professionals believed she could adequately parent her son. (*Kimberly R.*, at pp. 1078-1079.) In *Jamie M.*, the mother's schizophrenia was treatable by medication and the mother recognized her need for medication and for long-term psychiatric care; by the time of the dispositional hearing, she was rational and coherent, under psychiatric care, and on her medications. (*Jamie M.*, at pp. 534, 537, 540, 542.) In contrast to these cases, Cynthia A. denied any mental health problems and refused treatment; her mental health problems resulted in an inability to attend to and provide for her son; and she lacked the ability to care for her son without assistance, which she refused. The court's removal order was supported by substantial evidence.

13

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.