Filed 4/29/16  In re P.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re P.G., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>D.G.,<br><br>      Defendant and Appellant. | A146524<br><br>(Humboldt County<br>Super. Ct. No. JV150089) |

D.G. (Father), father of a two-year-old girl, P.G., appeals from the juvenile court's dispositional order placing P.G. with her mother (Mother) and removing her from his custody.  He contends the removal order was improper because there was a reasonable alternative to removal that should have been ordered.  We reject the contention and affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 21, 2015, the Humboldt County Department of Health & Social Services (Department) filed a dependency petition on behalf of then-one-year-old P.G. and two other minors in the household alleging the minors were at risk because Mother allowed them to be supervised by Father, who had inflicted injury to P.G.'s half sibling earlier

1

that year.  P.G. was present when Father caused the half sibling to suffer a black eye and bruising around his ear.

According to a May 19, 2015 report, the family came to the attention of Child Welfare Services (CWS) when CWS received a report on or about February 3, 2015 that P.G.'s half-sibling, then-four-year-old S.B., had been abused by Father, who was S.B.'s stepfather.  S.B. had a black eye and bruising about his face and said that "[D.]" (Father's first name) had caused the injury.  He said he was hit for wetting his bed, and that it was "a dad" who hurt him, not "a kid."  Mother said she was at work but saw bruises on S.B. when she came home and asked Father what had happened.  Father said he spanked S.B. for wetting the bed but denied giving him a black eye or bruises.  He told Mother that S.B. must have been injured when "playing rough with another 4-year-old at a party." S.B. reiterated that it was Father who had harmed him.  Upon hearing this, Mother appeared " 'disappointed and bummed out.' "

On February 20, 2015, a Department social worker made a scheduled home visit to interview the parents regarding S.B.'s injuries and the nature of physical discipline in the home.  Father acknowledged he "spank[ed]" S.B. for wetting the bed but denied hitting or leaving bruises on his face.  He said S.B. had suffered bruising while roughhousing with another child at a Super Bowl party.  When the social worker asked Father why the adults had not been alerted about "such a severe accident," Father responded that S.B. does not cry or come to him when he gets hurt.  During the interview, the social worker and the parents also discussed Father's struggle with heroin addiction. When asked whether he was willing to drug test, Father responded that he would have a dirty test because he had taken Vicodin and Norco for physical pain.

On February 26, 2015, the social worker visited S.B. at school but, in a marked departure from the previous interview, S.B. was fearful, guarded and not forthcoming. During attempts to engage him in conversation, S.B. refused to make direct eye contact, fidgeted, issued one word responses, and repeatedly glanced back and forth between the social worker and school representative in an anxious manner.  S.B. was in the same terrified state when the social worker made an unannounced visit to the home on

2

March 5, 2015. S.B. looked nervously between the social worker and Father and denied knowing or recognizing the social worker. Father said he spanked the children but that "the spankings never leave marks anymore." He said he used "time outs" as the primary form of discipline and that he never hit the children "above the waist," but later said he would "smack them upside the head to get their attention." Father restated his theory that S.B. suffered his injuries at the Super Bowl party, and said it would have been impossible for him to inflict such injuries without Mother's awareness because he "was never alone with the children." Father made inconsistent statements as to whether Mother was home the day S.B. was injured. Ultimately, he said Mother was at work and that when she returned and saw the injuries, she was "furious" and " 'freaking out,' " "demanding he tell her what happened." Mother thereafter sent him numerous " 'terrible' texts" and called him saying, " 'I know you did this.' " When the social worker asked Father why Mother would think he would harm S.B., Father said Mother "thinks the worst of him."

On March 16, 2015, the social worker called Mother in order to assess her ability to protect P.G. and the two half-siblings. Mother said, " 'I cannot stop the bruises from happening," and, " 'The only reason I have not booted him out of the home is because I do not have childcare for the hours I work and would lose my house and job.' " Mother expressed concern about Father using heroin again. The social worker requested a drug test, which Father refused. He also refused to provide two subsequent drug tests, on March 17, 2015, and April 8, 2015.

A Family Team Meeting (FTM) was convened on April 14, 2015 during which Mother said she feared Father was using heroin again, as he had ready excuses for the possibility of positive tests, e.g., that he had used narcotic pain medication for an abscess tooth. She was concerned that if Father was unable to " 'score any dope,' " he would take his frustration out on the children and "retaliate against" them while Mother was at work. Father was drug tested following the FTM and tested positive for opiates and THC. The Department recommended that P.G. remain in his parents' care while services were provided to address Father's substance abuse issues and inappropriate discipline, and Mother's inability to protect the children.

3

On May 19, 2015, the juvenile court found Father was P.G.'s presumed father. P.G.'s attorney objected to Father remaining in the home and requested a contested hearing. The following day, the parties reached a settlement whereby Father agreed to enter the Healthy Dads program and submit to random drug testing. The Department, in turn, agreed to provide child care assistance and transportation.

In a June 9, 2015 jurisdiction report, the Department stated that Father had drug tested five times and had tested positive for THC on two occasions and positive for alcohol on one. At a June 9, 2015 pre-trial hearing, all parties submitted to jurisdiction, and the juvenile court sustained the petition and scheduled a dispositional hearing.

In an August 25, 2015 disposition report, the Department stated that Mother was working two jobs. Previous CWS referrals indicated that Mother had a developmental disability. She had completed parenting programs and had adequate and safe housing for P.G. and her two other children. The report further stated that Father had struggled with a heroin addiction for a number of years. He said he had been able to maintain sobriety in the past and was willing to participate in programs. He had drug tested eight times between April and June 2015 and had provided "3 diluted drug tests, 1 drug test[] positive for THC (marijuana), 1 drug test positive for alcohol (ethanol) and THC (marijuana), 1 drug test positive for opiates and THC (marijuana), and 1 drug test with no substances detected."

Both Mother and Father had a CWS history as victims when they were minors. The two had a "complicated relationship" and a history of domestic violence. Attached to the report were a series of police reports regarding domestic violence incidents between the parents, including one severe physical altercation in which Father allegedly choked the Mother in the presence of the children. On or about June 29, 2015, Mother informed the Department that she and Father had separated and that Father had moved out of the family home in Eureka, California, and was staying at a friend's place in Scotia, California. Mother was transporting the children to the Father in Scotia everyday—which was a two-hour round trip drive—because she needed him to care for the children while she was at work. She worked a "non-typical work schedule" and it

was difficult, both schedule-wise, and financially, for her to find a childcare provider. Father said he was willing to engage in the Dads Program to address his substance abuse issues and attend a parenting program if he could obtain childcare.

Although Mother looked to Father for her childcare needs, she was allowing Father to have only supervised contact with the children. The Department concluded that Mother had demonstrated protective abilities by insisting upon supervised contact. It recommended that P.G. and his half siblings be placed with Mother with family maintenance services. Given the incident resulting in injuries to P.G.'s half sibling, the history of domestic violence, and Father's continued drug use, the Department recommended that P.G. be removed from Father and that Father be offered family reunification services.

Father did not appear at the dispositional hearing of August 12, 2015. Mother and the minors submitted on the Department's recommendations. Father's counsel objected to the recommendations on the ground that some time had passed since the incident in which S.B. was injured, and that there was "no nexus or present risk." He argued for family maintenance services for both parents. The juvenile court considered whether it would be sufficient to simply order Father to remain outside the family home, but ultimately found there was a substantial danger to P.G. unless she were removed from Father's custody, and that there were no reasonable means by which to protect her short of removal. The court removed P.G. from Father's custody and ordered family reunification services and supervised visits for Father. It then placed P.G. in Mother's custody and ordered family maintenance services for Mother. Father filed a timely notice of appeal.[1]

---

[1]The Department has filed a motion to dismiss in which it argues the appeal has been rendered moot by the juvenile court's subsequent orders awarding sole legal and physical custody to Mother and terminating the dependency. We conclude the appeal is not moot, and deny the motion to dismiss. (See *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548 [a father's appeal from a jurisdictional order was not moot where the court subsequently awarded the mother sole custody and terminated dependency jurisdiction, because the jurisdictional order provided a basis for the subsequent orders].)

**DISCUSSION**

Father contends the removal order was improper because there was a reasonable alternative to removal that should have been ordered. Specifically, he asserts that because he had already moved out of the family home at the time of disposition, the juvenile court should have simply ordered him to remain outside the home instead of taking away his custodial rights to P.G. by removing her from his custody. We reject the contention.

Welfare and Institutions Code, section 361, subdivision (c)(l),[2] provides: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence . . . [¶] . . . [that] [t]here is or would be a substantial danger to the physical, health, safety, protection or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor." A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.) The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536–537.)

Section 361, subdivisions (c)( l)(A)–(B), direct the juvenile court to consider alternatives before removing a minor from parental custody. For example, the court "shall consider, as a reasonable means to protect the minor," "[t]he option of removing an offending parent . . . from the home." (§ 361, subd. (c)(1)(A).) The court's determination as to whether a minor should be removed from the custody of a parent is a factual question subject to the substantial evidence standard of review. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

---

[2]All further statutory references are to the California Welfare and Institutions Code unless otherwise noted.

6

Here, there was clear and convincing evidence to support the finding that removing P.G. from Father's custody was necessary to protect her from substantial risk of harm. Father admitted using physical discipline on the children, including spanking them and hitting them below the waist—apparently with enough force to leave marks in the past—and "smack[ing] them upside the head . . . ." There was evidence he hit four-year-old S.B. in the face for wetting the bed, leaving him with a black eye and bruising about the face. Despite the fact that S.B. clearly stated and reiterated that it was Father who had harmed him, Father repeatedly denied causing the injuries and provided inconsistent statements.

Moreover, Father had a substance abuse history and initially refused drug testing despite repeated requests by Mother and the Department. He thereafter drug tested eight times between April and June 2015 and produced only one clean test. He had not successfully completed any programs to address his substance abuse issues and inappropriate discipline, was still using drugs, and had not addressed the violence giving rise to the case. The parents also had a "complicated relationship" and a domestic violence history that required law enforcement intervention and included one severe physical altercation in which Father allegedly choked the Mother in the presence of the children.

Mother acknowledged Father's heroin addiction and substance abuse issues and said she believed Father was the one who had injured S.B. Despite this, she initially said she could not "stop the bruises from happening" because she relied on Father for childcare and had no choice but to leave the children with him while she worked two jobs. She continued to leave the children with him while she worked despite her concern that he had resumed his heroin habit, and despite her fear that he would "retaliate" against the children out of frustration for not being able to " 'score any dope.' " Even after Father moved out of the home on or about June 29, 2015, Mother continued to drive the children two hours round trip to Father's place so that he could care for the children while she worked. While it is commendable that Mother insisted that Father be supervised while caring for the children, this was still a new development at the time of the

7

dispositional hearing, and it was yet to be seen how or whether the arrangement would work.

Father relies primarily on *In re A.R.* (2015) 235 Cal.App.4th 1102, for his position that the juvenile court should have simply ordered him to remain outside the family home.  His reliance on the case, however, is misplaced.  In *In re A.R.*, there were some concerns with the family, including the father's alcohol use and domestic violence, but A.R. and his half-siblings appeared well cared for, and at disposition, the court ordered that they remain in the parents' custody, with family maintenance services.  (*Id.* at p. 1105.)  Months later, the father voluntarily moved out of the home and disengaged from services.  (*Ibid*.)  A.R. and his half-siblings continued to live with the mother, and the parents arranged for supervised visits for the father, which were going well.  (*Id.* at pp. 1105, 1111, 1118.)  At a hearing on the Department's petition for modification under section 388 (388 petition) to discontinue family maintenance services to the father and order supervised visits for him, the court granted the Department's requests but also removed A.R. from his father's custody based on a finding that he was at substantial risk of harm due to the father's unresolved alcohol-related issues.  (*Id.* at pp. 1111–1112.)

The Court of Appeal reversed the order removing A.R. from his father's custody. (*In re A.R.*, *supra*, 235 Cal.App.4th at p. 1117.)  First, the court observed that the Department's "388 petition did not seek to change legal custody and there was no evidence that legal custody was a matter of dispute between the parents or a matter of concern to the Department." (*Id.* at p. 1120.)  "It is up to the Department to properly present the issue of legal custody to the court." (*Ibid*.)  Second, the Court of Appeal held the removal findings were not supported by substantial evidence because there was insufficient evidence of substantial risk to A.R.  (*Id.* at p. 1118.)  In concluding the evidence was insufficient, the Court of Appeal noted the father had moved out of the

home,[3] with no intent to return, and that the parents had a well established supervised visitation arrangement that was working well. (*Ibid.*)

In contrast, here, the Department did seek removal of P.G. from Father's custody; the issue was therefore properly before the juvenile court. In addition, the cases are factually distinguishable, as the issues that brought A.R. to the Department's attention were less serious than were the issues in this case. Further, the father in *In re A.R.* acknowledged his problems and at least initially—and periodically throughout the dependency case—participated in services, while Father here repeatedly denied he had harmed S.B., failed to acknowledge his substance abuse and other issues, and had not participated in services. Moreover, the parents' separation in *In re A.R.* was well settled; significant time had passed since the father began living away from A.R., it was unlikely he was ever going to return, the mother had been properly enforcing supervised visits for six months, and all of the visits had been appropriate. (*In re A.R.*, *supra*, 235 Cal.App.4th at p. 1118.) In contrast, here, the separation was still new. The incident that resulted in S.B.'s injuries had taken place less than six months before disposition, and Father had been away from the family home for only six weeks. In light of the injuries to S.B., the history of domestic violence, Father's inappropriate discipline and continued drug use, the short period of time that had passed since Father had moved out of the home, and Mother's continued reliance on Father for childcare, the court in this case could reasonably determine that simply ordering Father to remain out of the home was inadequate, and that it was necessary to order that P.G. be removed from his custody.

## DISPOSITION

The dispositional order is affirmed.

---

[3]The father had been out of the family home—and the parents had had a working supervised visitation arrangement—for approximately six months at the time of the hearing on the 388 petition. (*Id.* at pp. 1105, 1117.)

_____

McGuiness, P.J.

We concur:


_____

Pollak, J.


_____

Siggins, J.