Filed 9/20/24  In re C.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>C.H.,<br><br>  Defendant and Appellant. | F086801<br><br>(Super. Ct. Nos. 23CEJ300089-1, 23CEJ300089-2, 23CEJ300089-3, 23CEJ300089-4)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Judith A. Carlson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Franson, Acting P. J., Peña, J. and Meehan, J.

## INTRODUCTION

Appellant C.H. (mother) is mother of four children, sons C.S. (age 13), S.H. (age 11), E.H. (age 9), and daughter S.O. (age 9).[1]  The father is presumed to have passed away in May 2022.  The children were removed from mother's care after she was placed on a Welfare and Institutions Code, section 5150[2] hold, and subsequently detained and removed from mother's care.  Mother argues substantial evidence does not support the juvenile court's finding that there was a substantial danger to the children's physical health, safety, protection or physical or emotional well-being if they were returned home.  Additionally, mother argues there was not substantial evidence there were no reasonable means by which the children's physical health could be protected without removal, or that reasonable efforts were made to prevent or eliminate the need for removal.

We find substantial evidence supports the juvenile court's finding by clear and convincing evidence that there was a substantial danger to the children's physical health, safety, protection or physical or emotional well-being if they were returned to mother's care, and reasonable efforts were made to prevent the need for removal and were ineffective.  We affirm the juvenile court's August 23, 2023 disposition and jurisdiction order.

## PROCEDURAL AND FACTUAL HISTORY

*Juvenile Dependency Petition*

On April 4, 2023, the Fresno County Department of Social Services (the department) filed a section 300 petition alleging the children suffered, or there was a substantial risk that the children would suffer, serious physical harm or illness as a result of mother's failure or inability to supervise or protect the children adequately (§ 300, subd. (b)(1)(A)), and as a result of mother's failure or inability to provide regular care for

---

[1]     Together "the children."

[2]     Undesignated references to code are to the Welfare and Institutions Code.

2.

the children due to mother's mental illness, developmental disability, or substance abuse (§ 300, subd. (b)(1)(D)).

The petition alleged mother had untreated mental health issues which hindered her ability to provide regular care, supervision, and protection for her children. The petition stated that on April 2, 2023, mother was placed on a section 5150 hold for being in a manic state because she was unable to regulate her emotions or heart rate. Mother also had a history of suicidal ideation, self-harm and being placed on section 5150 holds, and the children were at substantial risk of suffering serious physical harm or neglect if left in mother's care.

*Events Preceding the April 5, 2023 Detention Hearing*

On April 2, 2023, at approximately 1:00 p.m., social worker Jenifer Moore responded to the Fresno Police Department and met with Officer Rodriguez and behavioral health clinician Jaime Carlos from Kings View Behavioral Clinic (Kings View). Rodriguez informed Moore that C.S. was brought to the police station by a family friend. Mother had called the friend and said she could not have C.S. in the home and wanted the friend to take C.S. " 'somewhere' " without specifying where or for how long. C.S. had reportedly been having behavioral problems since father's passing in May 2022. The friend tried to take C.S. to "the Sanctuary"[3] but it was closed. The friend then brought C.S. to the police station and asked for resources.

Rodriguez called Kings View but was informed C.S. did not meet the criteria for a section 5150 hold. Rodriguez then called mother, who said C.S. could not return home. She did agree to come to the station with her other children.

At the station, mother maintained that C.S. could not return home but was unable to provide a reason. During her conversation with Rodriguez, she began to cry

---

[3]     Sanctuary Transitional Shelter is an unhoused or otherwise displaced youth and young adult shelter operating in Fresno, California.

"hysterically" and fell to the ground.  She repeated that C.S. could not go home with her because he "does not like her" but could not otherwise provide a coherent explanation why she did not want C.S. home.

Carlos indicated mother was in a manic state because she was unable to regulate her emotions or heart rate.  Mother did not report prior mental health issues or diagnoses to Carlos.  When asked whether she had knowledge of a section 5150 hold, mother smiled and refused to speak.  Mother was taken to a crisis stabilization center, while screaming that her children could not go into foster care because S.O. was a female and would be molested.

Moore spoke with the children at the department office.  C.S. denied any inappropriate physical contact and said he always has enough food to eat and clothing to wear.  He denied that mother uses drugs or alcohol.  When asked why he was picked up by the family friend earlier that morning, C.S. stated that he yelled at mother when she woke him up.  C.S. stated that mother wanted him to clean, but he did not want to, and that mother had been " 'stressed out' " since father's death.  C.S. said mother does not always sleep or eat.  C.S. said two years earlier, mother and father were having an argument and mother cut herself with something sharp, and C.S. was worried she would do that again.  He also remembered that two years earlier, mother had asked C.S. to get her a crowbar and she proceeded to break father's car windows with it.  Another time, mother broke father's car mirrors and was arrested.

S.H. similarly did not have any negative comments about his care or home life but was worried that mother spent a lot of time on her phone talking to her boyfriend who lived in Ghana.  E.H. and S.O. also did not have any negative comments about their care or home life, and stated they had no worries except for E.H., who was worried about mother because she was taken away by ambulance.

On April 3, 2023, social worker Katrina Martinez spoke to mother by telephone.  Mother stated she was not aware why she was placed on a section 5150 hold, and that she

was not suicidal. When asked about what happened on April 2, 2023, mother said she and the children were going to visit the children's grandmother at the hospital, and C.S. was being defiant. He made a "piercing scream noise" and when mother told C.S. that the residents in the upstairs unit might be asleep, C.S. said he "sometimes has to scream." Mother called the maternal grandfather, Delbert W., to talk with C.S., but C.S. refused to talk to him.

Mother then called the family friend to take C.S. and took the other children to get bagels. Mother believed she felt C.S. needed to be removed from her home "for some time." After receiving a phone call from the police, mother went to the police station with her children. She said she cried at one point in her conversation with the officers and clinician, but the clinician "misconstrued" her crying. She told the clinician that her menstrual cycle was going to begin soon but the clinician didn't accept her response and that is why she was placed on a section 5150 hold.

Mother confirmed father passed away from cancer on May 17, 2022. She stated she was not suicidal because "God ha[d] given her strength." She did confirm that three years before she felt suicidal and had been placed on a section 5150 hold. When asked how she was able to stabilize herself afterward, mother answered in a vague manner, that she had felt "validated with those feelings" and she was "empowered to not feel that way and to rise above those feelings." She denied any current mental diagnoses or challenges, although she confirmed being diagnosed with an anxiety disorder in the past. She also used to take melatonin to help her sleep, but she no longer needed it.

Mother stated she was attending grief counseling, and C.S. had previously received grief counseling but stopped due to a scheduling conflict. Mother denied any of her children take medication and stated that C.S. was diagnosed with oppositional defiance disorder in 2021. Mother denied drug and alcohol use and stated she had been arrested for domestic violence one time about three years ago when she knocked a phone out of the father's hand. She took classes and the charge was dismissed.

5.

C.S. had previously stayed with Delbert in San Francisco for approximately six months, and had done well, but mother said she decided to return him to her care when Delbert went on a vacation. Delbert was willing to take C.S. back but he did not have a car.

Mother explained that she was not in a manic state at the police station, and that it was " 'that person's opinion.' " She had been walking around while talking to Rodriguez and Carlos to "get some exercise" and she had not been " 'bad.' " She wanted the children, including C.S., to be returned to her care. In the meantime, mother recommended the children be placed with Yazmin R., a family friend whose children attended the same school as the children.

On April 3, 2023, Martinez spoke with Yazmin about taking the children, who agreed to the placement. Yazmin described the children as "very good children" and while she did not believe mother was physically abusive toward them, she had suspicions about mother's mental health. Mother had "popped up" at Yazmin's home in the past. Yazmin's son had described some interactions with mother to Yazmin as well. On one occasion, C.S. made a comment about a movie to the son, and mother told C.S. to "stop being defiant." On another occasion, the son witnessed mother going into C.S.'s classroom to yell at him for leaving trash on the ground.

Yazmin also reported that mother had been repeatedly calling her on the phone asking to see and speak with the children. Martinez called mother in the presence of Yazmin and spoke with her about next steps. Mother asked if C.S. could remain with Yazmin and the other children could be returned to her. She also repeatedly asked if there was a possibility the children would be returned to her on April 4, 2023, after the team decision making meeting. Mother indicated she was "fine" and did not need services.

On April 4, 2023, a team decision making meeting was held on behalf of the children with several department staff, mother, Delbert, a maternal uncle, a maternal cousin, and Yazmin in attendance. Mother repeated that she had a family friend take C.S.

on April 2, 2023, because he was screaming, would not talk to Delbert on the phone and put his fingers in his ears. Mother stated multiple times she wanted C.S. to "have accountability" for his actions.

Mother said she does not spank her children and takes them to the library or to an indoor sports center as a form of punishment. Mother said she wanted C.S. to know the behavior was inappropriate and she performed a prayer circle with C.S. She said C.S. apologized "with tears in his eyes." Mother said she thought C.S. was trying to control her, talks with a "strong tone" and asks questions such as " 'Are we going to the library,' " or " 'Are we eating cereal.' " Mother then became tearful and said she was trying her best and wanted the police to speak with C.S. about his behavior. Social worker supervisor Greco-Fosdick said that mother looked overwhelmed and asked her if she felt that way. Mother said she felt overwhelmed at the police station which is why she had cried.

Delbert described mother's situation as "complex" and that the discussion "was barely hitting the tip of the iceberg." He stated he feared for mother's and the children's safety and wanted mother to receive "the help she needs." He said several people had asked mother to seek help, but she had not attempted to do so. Delbert also said father confided in him before dying, and father had asked Delbert to apologize to C.S. on his behalf for hurting C.S.

In response to Delbert's statements mother stated, " 'God is on my side and respects my liberty of consciousness.' " She said she felt like "she did not have a choice" and said " 'I have the right to not believe in counseling. I haven't said if I do or don't.' " She said she believed that whether she gets counseling or not should be confidential, and that her father was " 'outing' " her and was using her past against her.

Mother stated that C.S. had previously attended counseling and indicated she wanted to make an effort to get him back into counseling. The maternal uncle commented that he wanted what was best for mother and the children, and wanted mother

7.

to understand that everyone was not out to get her. Mother stated she sensed the department cared.

However, when social worker Leal-Monroy began explaining the voluntary family maintenance and potential safety plan, mother became fixated on the notion that her children were being removed from her care. She began to cry loudly and uncontrollably and to pray aloud. She called various friends and told them her children were being taken.

Greco-Fosdick explained that the primary concern was that when things didn't go mother's way, she was unable to have a conversation or come to an agreement. However, mother continued to cry uncontrollably. She said that people have "asked her for her children" because they are so pretty, and that they specifically wanted her daughter. She stated that her daughter was prettier than Yazmin's daughter. She claimed the department was upset they could not use "mind control" on her, and was telling her " '[s]ee, see.' " She stated that father was "dust in the ground," that "people wanted her daughter," and that the department was "satanic." Mother refused to sign any forms and left after being provided paperwork and information for court. The children remained in Yazmin's care.

On April 4, 2023, after the team decision making meeting, Martinez made a follow-up phone call with Delbert, who stated he had more information he did not feel comfortable sharing at the meeting. Delbert said that three or four years ago, mother asked him to care for C.S. because mother believed C.S. was "satanic." She did not articulate why she felt that way. Delbert said that mother again told him that C.S. was being "controlled by Satan" the prior week. He said that mother has been having C.S. and S.H. stay with others for some time.

Delbert said that C.S. was in his care for six months, but mother called him "out of the blue" and said she was driving up to San Francisco to get C.S. When he asked mother why, she responded that as C.S.'s mother, it was her decision. She then moved C.S. and S.H. into the home of an 80-year old couple from her church, noting that the

wife had Alzheimer's disease. Delbert said he did not believe mother was a fit parent, and that she needed to submit to psychiatric help. He commented that she became manipulative during meltdowns and was glad the department was involved.

Delbert said that when mother did not "get her way with men" she would threaten to kill herself. She had a history of section 5150 holds since the onset of her relationship with father, and when father tried to break up with her, she threatened to kill herself. He stated the children had seen mother "take a crowbar to their father's car." He said he believes mother's behavior is partially a mental health issue and partially performance acting. He said mother had an eating disorder since her teenage years and reported to him four years before that she used to "cut herself."

On April 4, 2023, Martinez also spoke with C.S. C.S. stated that on April 2, 2023, mother had been on the phone with Delbert and tried to force C.S. to speak with him. C.S. stated mother made him go into a small closet in his bedroom and she went inside the closet with him. During that time, mother was yelling at him, and continued to call Delbert. C.S. said he needed to use the bathroom, and mother said he needed to take accountability for what he had done, and he needed to speak with Delbert. C.S. then attempted to get on his bed in an effort to stop talking to Delbert. C.S. said he did not hit or touch mother, but she got on his hands and pinned him down on his bed. Mother told him, " 'You have a demon inside of you.' "

C.S. said that when he was eight years old, he did not want to listen to mother on one occasion, and she told his siblings he had a demon in him. He said mother yells at him a lot and tells him he is satanic. C.S said if he goes on social media, mother says he is being satanic, and has also started calling his siblings satanic a few times. However, she mostly yells at him. C.S. said " 'I feel like, what have I done? I'm just a normal kid. I'm not doing any satanic stuff. I feel like, why are you doing this to me? I could not even walk out of my room to use the restroom.' " C.S. stated he did not want to visit mother.

*Prior Referrals*

On March 28, 2012, the department received a call from a family therapist reporting concerns for 8-month-old infant C.S. in mother and father's care. Father had called the therapist reporting that mother had cut her wrists. An ambulance responded but did not take mother on a section 5150 hold because the cuts were superficial.

On December 27, 2019, the department received a call of suspected child abuse against C.S. C.S. had told the reporting party that he was spanked with a belt, but did not have any visible marks or bruises, and could not say the last time he was spanked. The report was resolved as unfounded.

On April 8, 2021, the department received a report that C.S. was "beyond control." The reporting party stated that C.S. had thrown a skateboard at father, swung a hose and hit him in the elbow, and thrown a bottle of oil at him. The reporting party stated that C.S. had broken two windows in the home, and the reporting party had sustained a bruise from C.S. The reporting party stated that C.S. harmed his siblings and mother and everyone in the home had to tailor their behaviors to him. The report was resolved as unfounded.

On April 9, 2021, the department received a report that father was afraid of one of the children because the child was throwing things at him. The reporting party described both mother and father as " 'crazy' " and said they should not be taking care of the children, but could not give specifics. The report was evaluated out.

On June 24, 2021, the department received a report that mother had gone to Arizona with the children. The reporting party stated mother left because father believed C.S. to be possessed by a demon because of his behaviors and wanted C.S. placed in a facility or foster care. The reporting party said mother also believes C.S. to be possessed but did not want to place him in a facility. In Arizona, mother stayed with an aunt. A day after arriving, C.S. "acted out" and law enforcement was called, after which C.S. was placed in a facility.

Family helped mother obtain stable housing, after which mother cut the family off. Mother was able to get C.S. back from the facility, but shortly after, C.S. "acted out" and mother kicked him out of the home in 119-degree weather. The reporting party called child protective services over the incident. Mother then became ill and refused to seek medical care, at which point father came to Arizona to care for her. The family returned to California. The report was resolved as unfounded.

On June 30, 2021, the department received a report that mother expressed to her brother she is suicidal, was cutting herself in front of the children and was overwhelmed with the children because father was not helping. The report was resolved as unfounded.

On December 7, 2022, the department received two reports regarding mother. The reporting party stated on July 16, 2022, mother had expressed in a group text "way too much pressure" and stated, " 'the devil is trying to kill me.' " When mother spoke to a family friend, she said something to the effect of, " 'I couldn't commit suicide because of the kids but if we were in the car and drove into a pond, we would all die together.' " The family friend took mother's two oldest children, who had been living with her since July 2022. The reporting party had spoken with the family friend, who was concerned about C.S. C.S. had made comments such as, " 'I wonder what would happen if I jump off a bridge or a building' " and " 'I wonder what would happen to me if I hit my head with this hammer.' " C.S. had also started chewing anything in sight, such as metal and wood. The reports were evaluated out.

*April 5, 2023 Detention Hearing*

The juvenile court held an initial detention hearing on April 5, 2023. Mother requested visitation and stated that she wants all of her children home as soon as possible. The court found a prima facie case had been made the children fell within the provision of section 300, that continuance of the children in the home of mother was contrary to the children's welfare and there was a substantial danger to the physical health of the children or the children were suffering severe emotional damage. The court further found there

11.

were no reasonable means by which to protect the children's health without removal, and reasonable efforts had been made to prevent or eliminate the need for removal. The court ordered supervised visitation a minimum of one time per week and ordered reunification services for mother including a mental health evaluation and recommended treatment. A combined jurisdiction and disposition hearing was scheduled for May 8, 2023.

*Events Preceding the Jurisdiction and Disposition Hearing*

Mother participated in a virtual visit with the children on April 12, 2023. The children were communicative and discussed school and other activities with her. The visit lasted the entire allotted time and ended with mother saying " 'love you forever' " to each of the children.

Mother participated in an in-person supervised visit on April 25, 2023. The children were initially excited to see mother and told her about going to the movies after the visit and going to see the maternal grandparents for 10 days. They told mother about their activities and said they had lately been eating meat.

C.S. then asked mother, " 'Why do you say it's satanic to eat meat?' " Mother responded, " 'I never said that.' " C.S., S.H., and E.H. then became frustrated with mother and said she was lying, while mother continued to deny what the minors were stating. C.S. then said that in the past, mother would hit him with a belt, would not let them eat when they are hungry and would not let them in the kitchen. On one occasion, C.S. said he snuck a cookie from the pantry and mother got on top of him and pulled the cookie out of his mouth because he took it without asking. S.H. and E.H. said they witnessed this happen, and mother denied it.

Mother sat quietly while the children questioned her about why she said everything is satanic. C.S. then said, " 'I am saying everything so that the social worker will document it.' " Mother said she loved the children and will love them forever. She also said it is not good to lie and that the adults should not be manipulating them. C.S. said on another occasion, mother pulled a corn chip out of his mouth because he did not

ask for it, and E.H. said he saw that incident. Mother again denied doing that to C.S., and the children called her a liar.

Mother requested to speak with the social worker outside. She said that she does not like the minors visiting the maternal grandparents because she " 'cut ties' " with them and they should not be " 'gossiping' " to her children. Mother said she is worried the care provider and maternal grandparents are " 'manipulating' " her children, and commented that her children are not happy. The social worker told mother it was her responsibility to redirect them.

When mother returned to the room, C.S. and E.H. began telling her how they wanted a " 'normal childhood.' " They expressed how they were having a good time having a "normal childhood" with their care provider and maternal grandparents. C.S. and S.H. said their care provider lets them in the kitchen, lets them eat whenever they are hungry, and that they "aren't hungry like they used to be when they were with her." C.S. and E.H. said " 'I want you to be a better mom.' " Mother responded that she loves them both. Mother and children spent the rest of the visit playing a board game. The children did not hug or kiss mother when the visit ended and pulled away when she tried to hug them.

Mother attended another supervised visit on April 26, 2023. She read to and played with the children, but they again did not want to hug or kiss her.

On May 19, 2023, Marcus Olivares, an investigator with Fresno Child Advocates, spoke with the children. C.S. said his visits with mother go well. However, he did not want to return to mother's care. C.S. said that he did not think mother can care for him because he has heard mother state to other people that she can care for his siblings, but not him.

S.H. stated that his visits with mother are also going well, but he likewise does not want to return to mother's care. S.H. said he did not think mother could care for him right now, because " 'she needs to go to more classes to learn how to feed us.' " E.H.

said he did not want to return to mother's care and did not think she could properly care for him because " 'she lies a lot.' " S.O. did not wish to reside with mother, but would like to reside with the maternal grandmother. When asked if S.O. believed mother could properly care for her, she said she was not sure, and that " 'she would probably feed me.' "

*August 23, 2023 Jurisdiction and Disposition Hearing*

The juvenile court held a combined jurisdiction and disposition hearing on August 23, 2023. Mother testified, as did several witnesses on her behalf. Jamal Jones, a licensed marriage and family therapist, had been working with mother for the past nine months. Jones testified mother initially came to him with concerns of grief and loss after losing her husband. They met biweekly with virtual visits, and had contact in between sessions when mother needed support.

Jones described mother as loving her children, and he believed she understood her responsibility to ensure their safety and well-being. He stated that the children were a regular part of their conversations because they impacted her mental health and well-being. Jones testified that mother never told him she did not want C.S. in the home, even though when she came to Jones for treatment in November 2022, C.S. and S.H. were living with members of mother's church. Jones did not recall if mother explained why the two children were not living with her and did not know the people they were living with. Jones testified he believed mother continued to need therapy to deal with issues such as emotional stability and her ability to cope with stress and life pressure.

Cheyenne Hernandez testified she lived with mother and the children from the summer to the winter of 2021. Hernandez described mother as an attentive parent with a close relationship with her children and did not see the children being put in danger or suffering any injuries. Hernandez described mother would sometimes get overwhelmed and would go into a room to take a moment and breathe. Hernandez gave examples of behaviors which would result in mother becoming overwhelmed, including the children

14.

running around the house, raising their voices, climbing on furniture, or arguing with one another. Hernandez also testified she saw mother go to several classes with her husband, which Hernandez believed to be couples classes for parenting.

Mother testified that on April 2, 2023, she and the children were planning to go do a "homeless ministry." This involved preparing lunches and donating blankets to community members in need. Around 7:00 a.m., mother woke up and C.S. "woke up with a piercing scream." Mother tried to get C.S.'s attention and tried to get him to acknowledge that he shouldn't scream. She was able to get him to agree that it was wrong, but mother nonetheless called Delbert to speak with C.S. C.S. refused to speak with Delbert, so mother called a family friend for help. According to mother, the friend offered to take C.S. to the Sanctuary, and when mother saw that it was temporarily closed, the friend said she knew some police officers who would talk with C.S.

On cross-examination, mother clarified that C.S. wasn't acting out or screaming but she still decided to send him to the police station because she "tried to implement consequences." She admitted telling C.S. that "if people are gossiping about me" and "if people are trying to get you to go against me" that "it's not right." She testified she did not remember making a statement that C.S. could not return home.

Mother also testified that she had "difficulties" with C.S. She had C.S. live with Delbert for about five months, and later with a family friend. Mother claimed that when C.S. lived with Delbert, she took him back because Delbert was going on a trip out of state and wasn't taking C.S. Mother decided to keep C.S. because she "just wanted to take care of [her] child." She then clarified that she sent C.S. to live with a family friend for a few months afterward.

Leslie Rocha-Barraza, a social worker assigned to mother's case, also testified. She stated that mother was doing well with her mental health services and was recommended a 52-week child abuse intervention program of which she had completed seven sessions. Regarding visitation, Rocha-Barraza stated that the children reported

15.

they enjoyed structured, supervised time with mother but were not comfortable being alone with mother during visits.

At a home visit on July 12, 2023, C.S. had told Rocha-Barraza that he did not want to go home with mother because he was afraid she would do something "outlandish." C.S. explained he was afraid that mother would take them away or would hurt him and his siblings. S.H. and S.O. did not respond when asked if they wanted to return home to mother, and E.H. said he wanted to return when he was older.

Rocha-Barraza stated she was approached by the care provider and Delbert outside of the courtroom, and informed that mother had come up to C.S. and told him, "don't say anything bad." C.S. confirmed that is what mother said. On another occasion, C.S. stated that mother tried to bribe him at one of the visits, and when visits were supervised mother would whisper into the children's ears.

Overall, Rocha-Barraza testified that the department believed there was substantial danger to the children's emotional well-being because the children had expressed that mother lies to them, withholds food and limits what they eat, and doesn't allow them to do "normal kid things" like watch TV, play video games or do other things that they enjoyed doing.

The juvenile court concluded:

> "Based upon the reports that were presented to the Court and the evidence that was presented to the Court including testimony and letters from parties as well as the certificate that was provided to the Court this afternoon, I will find that there is clear and convincing evidence that continuance of the children in the home of [mother] is contrary to the children's welfare and there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if the children were returned home and there are no reasonable means by which the children's physical health can be protected without removing the children from [mother's] physical custody.
>
> "That being said, I want to state that I agree … that [Jones's] testimony was credible. I believe that [mother] is making progress. I do not expect perfection from parents because I agree with [mother] that there

16.

is no perfect parent. However, given what she's been through, given what the children have been through, and given [mother's] testimony that all she wanted was support, I believe that this can be a positive experience for [mother] and that she can get the support that she needs from the [department] and that can help her be a better parent in the future.

"I share the concerns of the [d]epartment of the well-being—the emotional well-being of the children. I share the concerns of the [d]epartment and mother kind of confirmed this in her testimony, there's a difference between gossip and the children telling the truth about what goes on in their lives to professionals who are employed and who are—it is their responsibility to make sure that children are safe. And if [mother] is discouraging that I believe she's going to regret that decision later.

"We have people … employed in these professions for a reason and sometimes that's because there are strangers that cause harm to children. The children should not be [discouraged] from discussing their emotional, physical, well-being with people who are obligated to look out for their best interest.

"Something else that was noteworthy from [mother's] testimony and I may never know the answer to this question, what was wrong with [C.S.] on [April 2] when he woke up screaming. Her testimony was that it was a piercing scream so it would seem to this Court that prior to April 2[] there was some emotional instability going on with [C.S.]

"I'm concerned about mother's instability and I think that the children are reflecting that. I hope that the orders of this Court today and the participation by [mother] in services that are going to be asked of her help her to address the instability, the emotional instability."

The court found reasonable efforts had been made to prevent or eliminate the need for removal of the children from the home and to make it possible for the children to return to their home. The court found the extent of progress by mother toward alleviating or militating the causes necessitating placement in foster care had been minimal. The children were made dependents of the court pursuant to section 360, subdivision (d), placed with their current care provider, and mother was ordered services, including a mental health evaluation, and visitation.

## DISCUSSION

I. **Substantial Evidence Supports the Juvenile Court's Order Removing the Children From Mother's Custody**

Mother argues the juvenile court failed to identify the "substantial danger" to the children should they be returned to mother, therefore there was insufficient evidence to support their removal pursuant to section 361, subdivision (c)(1). Mother further argues she did not receive a mental health assessment or a professional diagnosis. Mother concludes neither her mental health issues, nor the harm caused the children was identified, therefore there was insufficient evidence to support the removal order. We affirm. We find the juvenile court properly considered the specific facts of this case when determining that there was a substantial danger to the children's well-being if they were returned to mother's custody, there was substantial evidence to support such a ruling, and mother need not have been diagnosed with a specific mental illness for the juvenile court to make such a finding.

### A. Legal Standard

Section 361, subdivision (c) prohibits the removal of a child from the physical custody of his or her parent unless the juvenile court finds clear and convincing evidence of certain enumerated circumstances. In relevant part, a child may be removed if "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent[] …." (§ 361, subd. (c)(1).)

A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.) The parent need not be dangerous and the minor need not have been actually harmed before removal

18.

is appropriate.  The focus of the statute is on averting harm to the child.  (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536 (*Jamie M.*).)

" '[O]n appeal, the substantial evidence test is the appropriate standard of review.  Thus, in assessing this assignment of error, "the substantial evidence test applies to determine the existence of the clear and convincing standard of proof …." ' " (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)  "In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders.  [Citation.]  Those findings and orders may not be disturbed if they are supported by substantial evidence.  [Citations.]  … 'Issues of fact and credibility are questions [of fact] for the trial court, not [the appellate] court.  [Citation.]  "The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." ' " (*In re Samkirtana S.* (1990) 222 Cal.App.3d 1475, 1487.)

### B.  Analysis

*Substantial Danger to the Children's Emotional Health*

The juvenile court found clear and convincing evidence that continuance of the children in the home of mother would be a substantial danger to their physical health, safety, protection, or physical and emotional well-being.  The court relied on the department's reports and evidence presented at the hearing, including testimony and letters, and the court's findings are well supported by the record.

There was evidence presented mother suffered from mental health issues.  Delbert told social workers that mother used to cut herself, and C.S. said that at least on one occasion she did so in front of him.  C.S. expressed worry that she would cut herself again.  Mother, on multiple occasions, would yell at C.S. and call him, and occasionally

his siblings, satanic. She told Delbert she believed C.S. was "controlled by Satan." On April 2, 2023, she told C.S. " 'You have a demon inside of you.' "

It is reasonable for the court to infer mother's mental health issue manifested as emotional instability. At the police station, when asked why C.S. could not return home, mother began crying "hysterically" and fell to the ground. She began screaming that S.O. was a female and would be molested. At the team decision making meeting on April 4, 2023, mother claimed that C.S. was trying to "control her" by talking to her with a "strong tone" and asking questions. She became fixated on the notion that her children were being removed, began to cry loudly and uncontrollably and to pray aloud, and claimed that "people" wanted her daughter and that the department was satanic.

The children also told a social worker that mother would call many things "satanic." C.S. said mother told his siblings that there was a demon in him. They said that mother would not only control what they ate but would go as far as to remove food from their mouths if they ate it without her permission. On two occasions, mother pulled food out of C.S.'s mouth—incidents witnessed by the other children. After living with their care provider, the children also commented that they "aren't hungry like they used to be when they were with [mother]."

Mother tended to deny or diminish the children's accounts and would be unable to recall or would lie about her own behavior. When the children confronted her about her withholding food and calling meat "satanic," mother denied it, resulting in the children becoming frustrated. Mother denied taking food out of the children's mouths or denying them food, and the children called her a liar. She then told a social worker that the maternal grandparents should not be " 'gossiping' " to her children. Outside the courtroom prior to testifying, she told C.S. that "if people are gossiping about [her] that it's not right." C.S. in turn said that mother told him not to say anything bad.

Mother's account of April 2, 2023, changed several times throughout the case. On April 3, 2023, mother told social workers that she and the children were going to visit the

children's grandmother at the hospital, and C.S. was being defiant. He made a "piercing scream noise" and mother ultimately called a friend to take C.S.[4] When she testified, mother claimed that she was getting the children ready to do a "homeless ministry" when C.S. woke up screaming. She tried to calm him down, then called a friend who recommended taking C.S. to the police station.

The friend, however, told officers on April 2, 2023, that mother had called her to take C.S. " 'somewhere' " and did not specify where or for how long. Mother told the friend that she could not have C.S. in the home. When officers spoke to mother on the phone, she said that C.S. could not return home. Mother asked a social worker if C.S. could stay with Yazmin and she could take the other three children home. At the August 23, 2023 hearing, when asked if she remembered making a statement that C.S. could not return home, mother answered "No."

C.S. told a social worker that on April 2, 2023, after he screamed, mother forced him to go into a small closet in his bedroom, where she yelled at him and tried to get him to speak with Delbert on the phone. When he refused, mother pinned him down on his bed, telling him he had a demon inside of him. At the police station on April 2, 2023, mother could not provide a coherent explanation why she did not want C.S. home, other than that C.S. "does not like her."

Finally, mother sent C.S., then C.S. and S.H. to live with other people. She sent C.S. to live with Delbert, then took C.S. back only to send him to live with friends from mother's church. Mother claimed she took C.S. back because Delbert was going on an out-of-state vacation. However, Delbert told a social worker that mother called him "out of the blue" and took C.S. because she was C.S's mother and "it was her decision." At the August 23, 2023 hearing mother testified that she "just wanted to take care of [her]

---

[4]     C.S. in turn told the social worker that mother woke him up to clean, and he did not want to, so he screamed.

child."  However, she sent both C.S. and S.H. to live with the family friends from church shortly afterward.

Many of these behaviors happened to the children or in their presence.  It is not unreasonable for the juvenile court to conclude that mother repeatedly calling C.S. satanic, beginning to call the other children satanic and saying C.S. is possessed by a demon, sending first C.S., then both C.S. and S.H. to live elsewhere, and engaging in self-harm and emotionally unstable behaviors, would be substantially dangerous to the children's emotional well-being.  Mother's denial or minimization of these behaviors compounds the harm.  It is likewise not unreasonable for the court to conclude that mother's withholding food to the point of getting on top of C.S. and pulling food out of his mouth, would be substantially dangerous to the children's physical and emotional well-being.

Finally, mother's behaviors clearly had an effect on the children.  None of the children wanted to return to mother's care.  And while the children were not entitled to decide where they would be placed,[5] the children's preference is evidence of actual harm caused by mother's behaviors.  C.S. did not believe mother could care for him, and believed mother would do something "outlandish" like hurt him and his siblings.  S.H. and S.O. were concerned mother did not know how to feed them.  E.H. said he did not believe mother could care for him because " 'she lies a lot.' "

Mother argues the juvenile court must specifically identify the "substantial danger" or the actual harm the children would suffer if they were returned to her. Section 361, subdivision (c) does not contain such a requirement.  Section 361, subdivision (e) requires the juvenile court to "state the facts on which the decision to remove the minor is based."  However, the court is not required to identify the substantial danger with the type of specificity mother is asserting.  Nonetheless, the court stated that

---

[5]     *In re John M.* (2006) 141 Cal.App.4th 1564, 1570.

22.

it was concerned about the emotional well-being of the children, particularly because mother was discouraging the children from speaking about their emotional and physical well-being. The court also found there was emotional instability going on before April 2, 2023, because C.S. was waking up screaming. Finally, the court found the children were reflecting mother's instability.

Mother argues when a parent of a dependent child has a mental health issue, the social worker must demonstrate with specificity how the minor has been or will be harmed by the parents' mental illness, relying on *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1657 (*Kristin H.*).

In *Kristin H.*, the four-and-a-half-year-old minor was removed from mother's custody after mother was placed on a psychiatric hold due to taking unknown drugs which made her sick. (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1643.) The minor had previously been found wandering alone on the street, and mother had reportedly been heard telling the minor, " 'I can't be bothered with you. I'm going to send you to the shelter.' " (*Ibid.*) The minor expressed she did not want to return home. (*Ibid.*) Mother had also previously attempted suicide by overdose, was taken to the hospital and the minor was taken into protective custody, which resulted in mother entering into an informal supervision agreement with the department of family and children's services. (*Id.* at p. 1644.)

The reunification process initially went well, with the minor and mother sharing a strong bond and the minor stating she wanted to return to mother's care. (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1646.) However, when the jurisdiction hearing was delayed, mother had an angry outburst and left the courtroom. (*Ibid.*) The social worker's report was largely positive but did note that mother coped poorly under stress and was unable to refrain from inappropriate behaviors and angry outbursts. (*Ibid.*) After mother received the report, she visited the minor and was unable to keep her anger under control. (*Ibid.*)

23.

Over the next several visits, she yelled at staff, refused to end visits to the point police were called, and threatened to sue the facility. (*Ibid.*)

Mother was formally evaluated, and the evaluating doctor found mother angry and agitated. (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1647.) While mother had no overt signs of depression or psychosis, the evaluating doctor noted he was " ' "impressed by her enormous denial and distortion of her situation" ' " and found mother tended to externalize her problems, laying fault with the social workers or police, but not herself. (*Ibid.*) The doctor found features of " ' "borderline, and to some extent antisocial personality disorders." ' " (*Ibid.*) The doctor concluded, " ' "[a]lthough she might be a devoted and attentive mother much of the time, her potential for anxious, impulsive, and neglectful behavior might be a hazard." ' " (*Ibid.*)

At the final jurisdictional hearing, mother denied the need for medication and stated she would not take any, expending "considerable energy assessing blame to others, 'more concerned with proving she is right than with doing what she needs to do to reunify with her child.' " (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1648.) The juvenile court sustained the petition and found clear and convincing evidence that returning the minor to mother would be detrimental. (*Ibid.*)

As in this case, in *Kristin H.* the mother relied on the proposition that "[t]he social worker must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness.…" (*Jaime M.*, *supra*, 134 Cal.App.3d at p. 542.) The appellate court disagreed. The court noted that in *Jaime M.*, there was no evidence that mother's mental illness would adversely affect her children. In *Kristin H.*, mother was a substance abuser who made no effort to ensure her daughter was safe. (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1657.) The mother was in denial about both her substance abuse and the importance of treating her mental problems and refused to acknowledge her responsibility or cooperate with professionals. (*Id.* at p. 1658.) The appellate court concluded that although it was apparent from the record the mother and daughter were

bonded, the evidence also supported the conclusion that the mother's emotional instability, substance abuse, and combative behavior presented a substantial risk of danger to the minor. (*Ibid.*)

The juvenile court in *Kristin H.* found mother's emotional instability and mental health issues prevented her from ensuring the minor's safety. Such a finding was sufficiently "specific" to show how mother's mental health issues posed a substantial danger to the minor.

Comparatively, the social workers in this case thoroughly documented mother's behavior and its effect on the children in the detention, jurisdiction, and disposition reports, as well as other supporting documents. Much like in *Kristin H.*, mother in this case also behaved in emotionally unstable ways which disregarded her children's well-being. Mother had a history of calling C.S. satanic and saying he had a demon inside of him, as well as sending him away to live with others. These behaviors were observed by the other children, and mother even began calling them satanic on occasion. On April 2, 2023, she sent C.S. away with a friend and told the friend not to return C.S. home. At the police station, and then at the team meeting, mother cried hysterically and said bizarre things such as her children would be molested, and the department was satanic. The children stated that mother would pull food out of their mouths. C.S. witnessed mother self-harm and was afraid mother would either do so again or would hurt him or his siblings. It is reasonable for the juvenile court to infer harm to at least the children's emotional well-being from mother's emotionally unstable conduct. The record in this case is replete with evidence to support the juvenile court's finding, by clear and convincing evidence, that returning the children to mother's care would pose a substantial danger to their physical or emotional well-being.

*Evidence of Mental Health Issues*

Mother argues that she was never diagnosed with a mental illness, and never participated in a mental health assessment. Relying on *Jamie M.*, she concludes it is not possible to determine how her mental health would adversely affect the children.

*Jamie M.* does not stand for the proposition that a parent's mental health issues *must* be formally diagnosed. To the contrary, *Jamie M.* clearly states that a diagnosis alone is not enough to justify removal, and that "[h]arm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be "infected" by the parent." (*Jamie M.*, *supra*, 134 Cal.App.3d at p. 540.) Instead, the juvenile court must "examine each factual situation to determine what type of detriment might result" and "a juvenile court should examine the question of parental custody from the child's view point." (*Id.* at p. 541.)

For a juvenile court to find jurisdiction pursuant to section 300, subdivision (b)(1)(D), which grants jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [t]he inability of the parent … to provide regular care for the child due to the parent's … mental illness," the juvenile court must find the existence of mental illness. That is because "the circumstances under which the juvenile court is authorized to take jurisdiction of a child are narrowly defined." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.)

Section 361, subdivision (c)(1) has no such limitation once jurisdiction is established. A juvenile court may remove a child from the physical custody of a parent when there is substantial danger to the physical health, safety, protection or physical or emotional well-being of the minor if the minor were returned home. (§ 361, subd. (c)(1).) Whether that danger arises from a parent's diagnosed (or undiagnosed) mental illness is relevant only insofar as it relates to the specific factual situation in each individual case. (*Jamie M.*, *supra*, 134 Cal.App.3d at p. 541.)

In this case, mother was not formally diagnosed with a mental illness. However, this does not negate mother's documented behaviors and the effect those behaviors had on the children. The juvenile court thoroughly reviewed the record and based its ruling not on the fact that mother may be suffering from mental health issues, but rather on mother's emotionally unstable behaviors and her attempts to prevent the children from speaking about their emotional and physical well-being. The record reflects substantial evidence of substantial danger to the children's physical health, safety, protection or physical or emotional well-being if they were to be returned to mother's custody.

## II. Sufficient Evidence Supports the Juvenile Court's Finding There Were No Reasonable Means to Prevent or Eliminate the Need for Removal

Mother argues there was no evidence that any reasonable alternatives to removal were considered and rejected or tried and failed. Mother further argues there was insufficient evidence that reasonable efforts were made to prevent or eliminate the need for removal. We find reasonable efforts were made and rejected by mother, and affirm.

Section 361, subdivision (e) states, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "that these efforts have proved unsuccessful. The court shall state the facts on which the decision to remove the minor is based."

"To aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home, the California Rules of Court require [the department] to submit a social study which 'must include' among other things: 'A discussion of the reasonable efforts made to prevent or eliminate removal.' " (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.)

Mother argues there is no evidence in the record that reasonable alternatives to removal were considered or tried. We disagree. The record reflects that on April 4, 2023, mother participated in a team decision making meeting on behalf of the children, with several department staff, several of mother's family members including Delbert, and the

27.

current care provider Yazmin in attendance. Delbert expressed concern for mother and wanted her to receive the help she needed, to which mother responded that she had the right not to believe in counseling, and whether she received counseling should be confidential.

Department staff then attempted to explain voluntary family maintenance and a potential safety plan to mother. In response, mother became fixated on the notion that her children were being removed from her care and began crying uncontrollably and praying out loud. Attempts to calm her failed, and mother concluded the meeting by claiming that people wanted her daughter, and that the department was trying to use mind control on her and was "satanic." She declined a parent partner referral, would not sign the language or Indian Child Welfare Act forms, and left. As a result, the department determined that voluntary family maintenance services were not appropriate and a safety plan could not be made.

Contrary to mother's assertion, this is not a case where the department failed to make a reasonable effort to prevent the children's removal. The department was prepared to discuss voluntary family maintenance and a safety plan which would have allowed the children to remain in mother's home. In response, mother began crying uncontrollably, refused to participate in the planning and made outlandish statements and accusations about the department.

Likewise, the record reflects that throughout the proceedings in this case mother minimized or refused to acknowledge the behaviors that led to the children's removal. She testified that she did not remember saying that C.S. could not return home on April 2, 2023, and her story about the events of that day was inconsistent throughout the development of this case. On August 23, 2023, she testified that it wasn't even her idea to remove C.S. from the home, and that the family friend she called recommended it. The friend, in turn, told officers that mother called her to take C.S. " 'somewhere' " and not return him home. Mother refused the children's allegations that she would call things

28.

satanic, limit their food, or take food from them. She minimized telling C.S. "not to say bad things" and telling him that gossiping is "not right."

Mother offers that unannounced visits, in-home support, or family therapy would have been sufficient. Given mother's extreme reaction to the department's attempts to develop a voluntary family maintenance and safety plan, and mother's persistent denial of her problematic behaviors, it is unclear how such services would prevent the harm which led to the children's removal. The department's efforts need only be *reasonable*. It is unclear what reasonable efforts the department could conceive to prevent the children from harm, other than removal. Substantial evidence supports the juvenile court's finding that reasonable efforts were made to prevent or to eliminate the need for removal of the children and that these efforts had proven unsuccessful.

## DISPOSITION

The juvenile court's disposition order is affirmed.